MARK ROSENBAUM (SBN 59940)
MRosenbaum@publiccounsel.org
TARA FORD (SBN 322049)
TFord@publiccounsel.org
MAYRA LIRA (SBN 273958)
MLira@publiccounsel.org
AMANDA MANGASER SAVAGE (SBN 325996)
ASavage@publiccounsel.org
AMELIA PIAZZA (SBN 342473)
APiazza@publiccounsel.org
JACOB MADDOX (SBN 354368)
JMaddox@publiccounsel.org
PUBLIC COUNSEL
610 S. Ardmore Avenue
Los Angeles, CA 90005
Telephone: 213.385.2977
Facsimile: 213.385.9089

KIMBERLY CLUFF (SBN 196139)
kimberly.cluff@caltribalfamilies.org
CALIFORNIA TRIBAL FAMILIES COALITION
226 W Ojai Ave, Suite 418
Ojai, CA 93023
Telephone: 916.583.8289

DAN MARMALEFSKY (SBN 95477)
DMarmalefsky@mofo.com
DAVID J. WIENER (SBN 291659)
DWiener@mofo.com
MICHELLE SOSA-ACOSTA (SBN 330776)
MSosaAcosta@mofo.com
JAMES K. MURRAY (SBN 352095)
JMurray@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco CA 94105
Telephone: 415.268.7000
Facsimile: 415.268.7522

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MCKINLEYVILLE UNION SCHOOL DISTRICT,

Plaintiff,

v.

U.S. DEPARTMENT OF EDUCATION; and LINDA MCMAHON, in her official capacity as U.S. Secretary of Education,

Defendants.

Case No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff McKinleyville Union School District ("McKinleyville" or the "District") brings this action, by and through its undersigned attorneys, against Defendants the U.S. Department of Education ("DOE") and Linda McMahon, in her official capacity as U.S. Secretary of Education (collectively, "Defendants").

Unless explicitly stated to the contrary, all allegations are based on information and belief. McKinleyville alleges as follows:

## INTRODUCTION

1.     McKinleyville seeks declaratory and injunctive relief from Defendants' unlawful agency actions and procedural violations that threaten critical mental health support services for its students.  Defendants previously awarded McKinleyville a five-year grant under DOE's School-Based Mental Health Services Grant Program ("SBMH Grant Program"), enabling McKinleyville to provide vital, necessary, and otherwise unavailable mental health support to hundreds of students in rural schools in Humboldt County, California.  Under the statutes and implementing regulations that govern the SBMH Grant Program, Defendants may consider only grantee performance when evaluating whether to continue to fund a grant.  However, in direct violation of Congress's statutory directives and DOE's own established processes, and without any consideration of McKinleyville's performance under the grant, Defendants announced just four months into McKinleyville's award period that they would not continue McKinleyville's funding beyond one year.  McKinleyville therefore needs the Court's intervention to compel Defendants' compliance with statutory requirements and safeguard the Humboldt County community.

2.     This case concerns funding apportioned by Congress to address the immense need for, and critical importance of, school-based mental health services.  Established in 2020, the SBMH Grant Program provides funding for State Education Agencies ("SEAs") and Local Education Agencies ("LEAs") to increase the number of credentialed mental health services providers for school-based mental health services in high-need schools. The SBMH Grant Program is a sister program to the Mental Health Services Provider Demonstration Grant Program ("MHSP Grant Program"), established in 2018, which strengthens and expands the workforce pipeline by supporting evidence-based partnerships between institutions of higher education and high-needs

school districts to train school mental health professionals. Between 2019 and 2024, DOE awarded hundreds of multi-year SBMH and MHSP grants across the country.

3. McKinleyville, in Humboldt County, is a paradigmatic example of the school districts Congress intended to serve with the SBMH and MHSP grants. Nearly two-thirds of students in Humboldt County are socioeconomically disadvantaged,[1] and rates of Adverse Childhood Experiences ("ACEs")—traumatic events such as abuse or homelessness—are among the highest in California.[2] By high school, more than one-in-five Humboldt students report they have considered suicide.[3]

4. Humboldt County is also the traditional, ancestral, and present homeland of several Native peoples whose members attend Humboldt County public schools.[4] The Native community faces significant trauma requiring mental health services that are often accessible only through the school system.

5. Humboldt County students are often entirely dependent on school-based mental health services. As in many districts across the country, especially those in under-resourced and rural areas, Humboldt County schools are the only available source of mental and behavioral health care for most students.[5] Students are *six times* more likely to complete mental health treatment when it is available at school.[6]

---

[1] *Free and Reduced Price Meals – 2024-25*, Cal. Dep't of Educ. (Oct. 20, 2025), https://dq.cde.ca.gov/dataquest/Cbeds2.asp?FreeLunch=on&cChoice=CoProf2&cYear=2024-25&TheCounty=12%2CHUMBOLDT&cLevel=County&cTopic=FRPM&myTimeFrame=S&submit1=Submit (*see* row for Humboldt County of Education).

[2] *Healthy Beginnings / Reducing Adverse Childhood Experiences*, Let's Get Healthy California, https://letsgethealthy.ca.gov/goals/healthy-beginnings/adverse-childhood-experiences (last visited Oct. 20, 2025) (*see* Parent Reported data).

[3] WestEd, *California Healthy Kids Survey: Humboldt County, Secondary 2021-2023 Main Report*, Cal. Dep't of Educ. at 31 (Apr. 20, 2024), https://data.calschls.org/resources/Humboldt_County_2123_Sec_CHKS.pdf.

[4] We note that federal law uses the term "Indian" when referencing federally recognized tribes, tribal reservations, pueblos, and federally recognized Alaska Native villages in the United States. We use the more formal term "Native" in this complaint.

[5] *The Impact of Federal Support for School Mental Health Services*, Nat'l Ass'n of Sch. Psych. at 1, 3 (2025), https://www.congress.gov/119/meeting/house/118317/documents/HHRG-119-ED00-20250604-SD003.pdf ("NASP White Paper").

[6] U.S. Dep't of Educ. and Off. of Special Educ. and Rehab. Servs., *Supporting Child and Student Social, Emotional, Behavioral, and Mental Health Needs* at 5 (2020), https://www2.ed.gov/documents/students/supporting-child-student-social-emotional-behavioral-mental-health.pdf.

6. In May 2024, McKinleyville applied for SBMH Grant Program funding on behalf of an LEA consortium, the Northern Humboldt School Based Mental Health Consortium ("NH Consortium"), comprised of McKinleyville and two nearby school districts. In October 2024, DOE awarded McKinleyville a five-year SBMH Program grant enabling NH Consortium districts to hire, train, and retain mental health personnel, thereby reducing student-to-provider ratios and enabling earlier and more effective mental and behavioral health interventions for their students.

7. This essential work, however, is now in jeopardy. On April 29, 2025, just four months into McKinleyville's award period, DOE sent a boilerplate two-page Notice of Non-Continuation of Grant Award (the "Non-Continuation Decision") to McKinleyville, informing it that the SBMH Program grant awarded to the District "reflect[s] the prior Administration's priorities and policy preferences and conflict[s] with those of the current Administration" and "no longer effectuates[] the best interest of the Federal Government and will not be continued." *See* **Ex. C** at 1. DOE stated that it would not fund the grant beyond December 31, 2025. The Non-Continuation Decision lacks any information explaining the change in the Federal Government's "best interest" or how McKinleyville's SBMH-funded program is inconsistent with this new interest.

8. DOE is required to base its continuation decisions ***solely*** on grantee performance. *See* 34 C.F.R. § 75.253(b) (2024). Here, however, Defendants' decision to not continue the grant after 2025 was not tied to or based on any actions by McKinleyville, such as a violation of the grant terms. Nor did McKinleyville stray from the subject matter or purpose for which it received funding. Indeed, the Non-Continuation Decision does not reflect *any* individualized assessment or analysis of McKinleyville's programs. Nor could it—McKinleyville's first annual performance report is not due until February 2026.

9. Instead, DOE discontinued SBMH and MHSP grants nationally and without any individualized analysis precisely because they addressed, *as required by Congress and DOE's own program requirements*, how the recipient would increase the availability of qualified, credentialed SBMH providers who would provide "equitable" access to mental health services in underserved communities. *See* 20 U.S.C. § 1228a(b); *see also* Applications for New Awards; School-Based

Mental Health Services Grant Program, 89 Fed. Reg. 15,173, 15,175 (Mar. 1, 2024).

10.    McKinleyville promptly sought reconsideration of the Non-Continuation Decision. However, in a September 12, 2025 letter, Defendants reiterated their prior unlawful decision, stating that the McKinleyville SBMH grant "provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflicts with those of the current Administration…." *See* **Ex. E** at 1.

11.    Defendants' unlawful agency actions and procedural violations underlying the Non-Continuation Decision contravene administrative law and the Constitution.

12.    **First**, the Non-Continuation Decision violates the Administrative Procedure Act ("APA") because it is arbitrary and capricious, contrary to law, and contrary to the Constitution.

13.    **Second**, the Non-Continuation Decision violates the Due Process Clause of the Fifth Amendment to the Constitution because it failed to give McKinleyville fair notice or an opportunity to be heard and is unconstitutionally vague.

14.    **Third**, the Non-Continuation Decision is an *ultra vires* action in violation of the Spending Clause of the U.S. Constitution because Defendants retroactively changed the conditions of McKinleyville's grant agreement after the grant was awarded.

15.    **Fourth**, the Non-Continuation Decision is an *ultra vires* action in violation of the Take Care Clause of the U.S. Constitution because it declines to execute or otherwise undermines statutes enacted by Congress or duly promulgated regulations implementing such statutes, and it attempts unilaterally to amend, cancel, undermine, or otherwise decline to execute duly enacted Congressional appropriations.

16.    Because of the Non-Continuation Decision, McKinleyville will be forced to lay off multiple school-based mental health providers and cut mental health services and training programs, preventing the District from offering mental health services crucial for students' academic achievement, psychological wellbeing, and physical safety.  If children do not receive critical mental health services in school, many will not be served at all.  For too many students in Humboldt County, whether mental health services are provided may be the difference between life and death.

17.    McKinleyville seeks relief from Defendants' implementation of unlawful policies, directives, and priorities.  The Non-Continuation Decision has caused McKinleyville to suffer and to face imminent significant harm from the disruption of critical mental health services amidst the heightened complex trauma affecting Humboldt County students.  For this reason, McKinleyville seeks a declaration and injunctive relief that rescinds the Non-Continuation Decision and enjoins further unlawful non-continuation decisions, directives, and policies.

## JURISDICTION AND VENUE

18.    The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under federal law, including the United States Constitution, federal statutes, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. and 5 U.S.C. §§ 702, 704.  An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 705–06.

19.    Venue properly lies within the Northern District of California pursuant to 28 U.S.C. § 1391(e)(1) because this district is where McKinleyville resides, received the Non-Continuation Decision, and its resulting harm occurred and will continue to occur unless enjoined.

## PARTIES

### A.    Plaintiff McKinleyville

20.    Plaintiff McKinleyville Union School District is an educational agency located in McKinleyville, Humboldt County, California.  The District serves approximately 850 students in Transitional Kindergarten through eighth grade across three campuses.

### B.    Defendants

21.    Defendant U.S. Department of Education is an agency of the United States government headquartered in Washington, D.C.  DOE is a federal agency within the meaning of the APA, 5 U.S.C. §551(1), and is responsible for the governmental actions at issue in this lawsuit.

22.    Defendant Linda McMahon is the U.S. Secretary of Education and is sued in her official capacity.

## FACTUAL ALLEGATIONS

### I. HUMBOLDT COUNTY STUDENTS FACE SEVERE MENTAL HEALTH OBSTACLES

23. McKinleyville is located in Humboldt County, a federally-designated rural county among California's most isolated regions. Humboldt lies five hours north of both San Francisco and Sacramento and spans over 1.5 million acres of mountainous, forested lands, bordered by the Pacific Ocean. According to 2020 Census data, Humboldt County is home to approximately 135,000 people scattered over 3,568 square miles. Approximately 16% of Humboldt residents live in poverty.



24. Most towns in Humboldt are unincorporated, meaning the County provides most municipal services. Transportation is challenging due to inclement weather, mud, rockslides, and a lack of public transit. Many areas lack internet access and cellular service. Tribal lands are particularly isolated.

25. Humboldt County has California's highest rate of Adverse Childhood Experiences:[7] Fifty-eight percent of Humboldt County children suffer multiple ACEs vs. 36% statewide, and 28% of adults in Humboldt County report experiencing four or more ACEs vs. 15% statewide.[8] The rate of child abuse and neglect reports in Humboldt County—86.4 per 1,000 children in 2024—is nearly twice the rate of California's average.[9] By high school, more than one-in-five Humboldt students report they have considered suicide.[10]

26. Although there is significant need for mental health services, the rural and remote nature of Humboldt County severely limits access to mental health care, especially for children. There is a critical shortage of pediatric psychologists and psychiatrists in the region. Waitlists for counseling and other mental health treatments can be months long. Even families with private insurance through their employers are often unable to find a clinician. For residents who secure an in-person appointment, transit to a provider within Humboldt County can take several hours.

27. Humboldt County schools have historically struggled to hire and retain mental health professionals. Even when funding is available, it is difficult to recruit school psychologists, school counselors, and school social workers to move to—and stay in—an isolated region of California, especially when there are more economically rewarding opportunities in other areas.

28. McKinleyville currently serves approximately 850 students in Transitional

[7] ACE events occur before a child is seventeen and include experiencing violence, abuse, or neglect, witnessing violence, and having a family member attempt or die by suicide. Other traumatic experiences that impact long term health include experiencing food insecurity, experiencing homelessness or unstable housing, or experiencing discrimination.

[8] *Healthy Beginnings / Reducing Adverse Childhood Experiences*, Let's Get Healthy California, https://letsgethealthy.ca.gov/goals/healthy-beginnings/adverse-childhood-experiences (last visited Oct. 20, 2025).

[9] D. Webster et al., *CCWIP reports: Child Maltreatment Allegation Rates*, U.C. Berkeley Cal. Child Welfare Indicators Project (2025), https://ccwip.berkeley.edu/childwelfare/reports/AllegationRates/MTSG/r/rts/l.

[10] WestEd, *California Healthy Kids Survey, Humboldt County Secondary 2021-2023: Main Report*, Cal. Dep't of Educ. at 31 (Apr. 20, 2024), https://data.calschls.org/resources/Humboldt_County_2123_Sec_CHKS.pdf.

Kindergarten through eighth grade on three campuses. Sixty percent of McKinleyville students are socioeconomically disadvantaged. A variety of factors—from lack of transportation to unaddressed mental health problems—contribute to an epidemic of absenteeism in the District. One in three middle school students is chronically absent, meaning they miss at least 10% of school days in an academic year; for Native students, the rate of chronic absenteeism is a staggering 57%.

29.     In the 2024–25 academic year, McKinleyville had just one school counselor and two school psychologists for over 800 students across three campuses. With more than one-in-eight students enrolled in special education services, the school psychologists provided largely special education services (e.g., student assessment and developing Individualized Education Programs) and only very limited mental health counseling.[11] McKinleyville did not have *any* school social workers during the 2024-25 academic year.

30.     McKinleyville is in dire need of additional funding for mental health services. The District is running a deficit and has been forced to make a number of sacrifices in order to balance its budget, including laying off teachers. Most recently, in April 2025, the District school board made the difficult decision to consolidate the District's two elementary schools at the conclusion of the 2025–2026 academic year—a major but necessary change to ensure the District's fiscal sustainability.

31.     Other Humboldt school districts are in similar positions. In nearby Arcata Elementary School District ("Arcata") and Pacific Union School District ("Pacific Union"), more than 50% of students are socioeconomically disadvantaged and a disproportionate number are chronically absent. Both districts are running a structural deficit and still do everything they can to provide support services to their students.

---

[11] *See 2024-25 Special Education Enrollment by Program Setting: McKinleyville Union Elementary Report (12-62950)*, DataQuest – Cal. Dep't of Educ., https://dq.cde.ca.gov/dataquest/DQCensus/SPEDEnr.aspx?cds=1262950&agglevel=District&year=2024-25&initrow=Eth&ro=y (last visited Oct. 22, 2025) (listing the number of students enrolled in special education).

## II.    SCHOOL-BASED MENTAL HEALTH GRANTS ARE NEEDED FOR CRUCIAL MENTAL HEALTH SERVICES

### A.    The Need for School-Based Mental Health Services

32.    Across the United States, students are experiencing a mental health epidemic that can lead to devastating consequences if left untreated.  Unaddressed student mental health needs lead to short- and long-term health problems, lower academic performance, increased school suspensions and expulsions, and a higher risk of students dying by suicide and drug overdose.[12] Today, suicide is a leading cause of death for youth aged 10–18 years old.[13]

33.    Students exposed to chronic or repeated unaddressed trauma experience a substantial impact on their developing brains and ability to learn and participate in school.[14] Research shows, for example, that when controlling for other factors, children exposed to violence have decreased reading ability,[15] lower grade-point averages (GPAs),[16] more days of school absence,[17] and decreased rates of high school graduation.[18]  Exposure to two or more ACEs makes a student 2.67 times more likely to repeat a grade.[19]  In short, unaddressed trauma is a powerful

---

[12] NASP White Paper at 5; Anne Richter et al., *Implementing School-Based Mental Health Services: A Scoping Review of the Literature Summarizing the Factors That Affect Implementation*, 19 Int. J. Environ. Res. Public Health 3489 at 1 (Mar. 15 2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC8948726/pdf/ijerph-19-03489.pdf.

[13] *FastStats – Adolescent Health*, CDC (July 15, 2025), https://www.cdc.gov/nchs/fastats/adolescent-health.htm; FastStats – Child Health, CDC (July 15, 2025), https://www.cdc.gov/nchs/fastats/child-health.htm.

[14] *See* Alexandra Cook et al., *Complex Trauma in Children and Adolescents*, Nat'l Child Traumatic Stress Network at 10–11, 15, (2003), https://www.nctsn.org/sites/default/files/resources/complex_trauma_in_children_and_adolescents.pdf.

[15] *See* Rosalind Duplechain et al., *Striking Differences: The Impact of Moderate and High Trauma on Reading Achievement*, 29 Read. Psychol. 117 (2008), https://www.tandfonline.com/doi/abs/10.1080/02702710801963845.

[16] *See* Larissa Borofsky et al., *Community Violence Exposure and Adolescents' School Engagement and Academic Achievement Over Time*, 3 Psychol. Violence 381 at 7 (2013), https://pmc.ncbi.nlm.nih.gov/articles/PMC3806333/.

[17] *See* Jacquelin Rankine et al., *School Absenteeism Among Middle School Students with High Exposure to Violence*, 22 Acad. Pediatr. 1300 at 1 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9509495/.

[18] *See* Michelle Porche et al., *Childhood Trauma and Psychiatric Disorders as Correlates of School Dropout in a National Sample of Young Adults*, 82 Child Dev. 982 at 1-2 (2011), https://pmc.ncbi.nlm.nih.gov/articles/PMC3089672/.

[19] Christina D. Bethell et al., *Adverse Childhood Experiences: Assessing the Impact On Health and School Engagement and the Mitigating Role of Resilience*, 33 Health Affairs 2106, 2111 (2014), https://www.peace4gainesville.org/uploads/5/1/1/0/51106965/assessing-ace-on-children-in-school.pdf.

predictor of academic failure.

34. Unaddressed student trauma is a pressing issue for McKinleyville. Students in Humboldt County are particularly susceptible to the effects of unaddressed trauma given the County's rural setting. The Rural Health Information Hub ("RHIhub"), funded by the Federal Office of Rural Health Policy, documents that the rate of suicide among rural youth aged 15–19 is 73.6% higher than for urban youth, and has increased 74% over the past 12 years.[20]

35. Native youth in Humboldt County are also at particular risk. CDC reports that Native youth are the most impacted by suicide.[21]

36. Without appropriate intervention and support, students whose learning is impacted by mental health conditions, including complex trauma, are denied the full opportunity to learn and receive the benefits of a public education. The impact of complex trauma will follow students throughout their schooling and may exacerbate substance abuse, withdrawal from school, absenteeism, and increased rates of death by suicide, as well as affect students' lifelong wellbeing.

### B. School-Based Mental Health Services Are a Proven Intervention

37. The majority of students who access mental and behavioral health care do so at school. For many students, especially those in under-resourced and rural areas, schools are their only available source of mental and behavioral health care.[22] Students are six times more likely to complete mental health treatment when it is available at school.[23] The immense need for and significant potential of school-based mental health programs underscore what DOE has called "the critical importance of true education-mental health system partnerships."[24]

38. School-based mental health services are necessary for providing effective mental

[20] *Rural Suicide Prevention Toolkit – Suicide in Rural Areas*, RHIhub (Apr. 2, 2025), https://www.ruralhealthinfo.org/toolkits/suicide/1/rural.
[21] *Health Disparities in Suicide*, CDC (May 16, 2024), https://www.cdc.gov/suicide/disparities/index.html.
[22] NASP White Paper at 1, 3.
[23] U.S. Dep't of Educ. and Off. of Special Educ. and Rehab. Servs., *Supporting Child and Student Social, Emotional, Behavioral, and Mental Health Needs* at 5 (2020), https://www2.ed.gov/documents/students/supporting-child-student-social-emotional-behavioral-mental-health.pdf.
[24] U.S. Dep't of Educ. and Off. of Special Educ. and Rehab. Servs., *Supporting Child and Student Social, Emotional, Behavioral, and Mental Health Needs* at 17 (2020), https://www2.ed.gov/documents/students/supporting-child-student-social-emotional-behavioral-mental-health.pdf.

health care to students.  These services reduce the cost of mental health services generally, minimize the stigma associated with such services in unfamiliar places, facilitate transportation to and from such services, and reduce family-work scheduling challenges.

39.    School-based mental health professionals frequently partner with teachers in understanding and meeting students' academic, social, and emotional needs, ensuring that students can participate in classroom learning.  For example, when student behavior becomes disruptive, teachers without additional support may resort to exclusionary discipline, such as removing a student from the classroom.  This leads to students missing instruction and learning, losing trust in the teacher, and gaining an incentive to behave poorly to be removed from class in the future.  School-based mental health professionals are often able to help the teacher and student repair trust and develop interventions that help the student maintain their behavior during instruction.  A school-based mental health professional can observe student behaviors, develop theories of behavioral function, and develop a plan to help both the student and the teacher.

40.    Finally, school-based mental health services are crucial for school safety.  Mental health service providers can assess a potential safety threat before there is any violence, ensure that a student who is struggling gets the help they need, and protect the safety of the entire school, which prevents other students from experiencing traumatic events at school.  Additionally, when students do experience a traumatic event at school, school based mental health service providers' training enables them to support students and staff in the aftermath, balancing physical and psychological safety through coordinated prevention and recovery efforts.

### C.    Under-Resourced Schools Struggle to Provide Crucial Mental Health Services

41.    Unfortunately, a pervasive shortage of qualified professionals has left school districts across the country with little or no capacity to provide mental health services at a time when students have unprecedented and growing academic, mental, and behavioral health needs.  Both state and local education agencies report that school mental health workforce shortages leave positions in high-needs and rural schools unfilled for years on end.

42.    Additionally, districts often struggle to hire mental health professionals who are

representative of the students and communities they serve, and whose presence in schools encourages students to access needed mental health supports.[25] This is due in part to the relative homogeneity of the mental health services provider workforce, as the cost of graduate-level training is prohibitive for many.

## III. CONGRESS ACTS TO ADDRESS THE STUDENT MENTAL HEALTH CRISIS AND DOE AWARDS HUNDREDS OF MHSP AND SBMH GRANTS

### A. Congress Establishes the SBMH and MHSP Grant Programs to Expand Schools' Capacity to Provide Mental Health Services

43. On February 14, 2018, seventeen students and staff were killed in a mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida. In the wake of this tragedy, Congress established the MHSP and SBMH Grant Programs to address the unmet need for adequate mental health services in K–12 schools. Both grant programs are authorized under Section 4631(a)(1)(B) of the *Elementary and Secondary Education Act* of 1965 ("ESEA") (20 U.S.C. 7281).

44. In 2019, DOE held its first grant competition under the MHSP Grant Program, which "provides competitive grants to support and demonstrate innovative partnerships to train school-based mental health services providers for employment in schools and local educational agencies (LEAs)."[26]

45. In 2020, Congress appropriated an additional $10 million to "increase the number of counselors, social workers, psychologists, or other service providers who provide school-based mental health services to students."[27] That year, DOE held its first competition for the SBMH Grant Program, which "provides competitive grants to State educational agencies ("SEAs") to increase the number of qualified . . . mental health service providers (service providers) providing school-based mental health services to students in local educational agencies ("LEAs") with

[25] NASP White Paper at 7.

[26] Applications for New Awards; Mental Health Service Professional Demonstration Grant Program, 84 Fed. Reg. 29,180 (June 21, 2019).

[27] Applications for New Awards; School-Based Mental Health Services Grant Program, 85 Fed. Reg. 32,025 (May 28, 2020); *see also* Applications for New Awards; School-Based Mental Health Services Grant Program, 89 Fed. Reg. 15,173 (Mar. 1, 2024).

demonstrated need. . ."[28] Starting in 2022, LEAs and consortia of LEAs were also invited to apply for SBMH program grants.[29]

46. After these programs were established, Congress increased their funding, allocating $55 million for the MHSP program and $56 million for the SBMH program in 2022.[30] Months later, after a mass shooting at Robb Elementary School in Uvalde, Texas, Congress allocated an additional $1 billion in funding for the SBMH and MHSP grant programs, to be distributed over fiscal years 2022 through 2026, under the *Bipartisan Safer Communities Act of 2022* ("BSCA").[31]

47. After Congress enacted the MHSP and SBMH programs, DOE held grant competitions and awarded hundreds of multi-year grants to LEAs, SEAs, and IHEs across the country, including the grant to McKinleyville's consortium.

### B. After the Initial Grant Award, DOE Must Base Its Award Continuation Decision on a Grantee's Performance

48. SBMH and MHSP grant applications are selected by the Secretary of DOE based on applicable statutory and regulatory requirements, including the priorities, selection criteria, and other requirements published in the Federal Register after formal DOE rulemaking.[32] For each program, DOE identifies both "absolute priorities," which are required for each grant proposal, and "competitive preference priorities," which are optional but earn applicants extra points in the application process.

49. The 2024 Federal Register Notice for Applications for New Awards for the SBMH program identified four "absolute priorities" and two "competitive preference priorities." The absolute priorities established for the SBMH program grant require applicants to be: (1) SEAs

[28] Applications for New Awards; School-Based Mental Health Services Grant Program, 85 Fed. Reg. 32,025 (May 28, 2020).
[29] Applications for New Awards; School-Based Mental Health Services Grant Program, 87 Fed. Reg. 60,137, (Oct. 4, 2022).
[30] Joint Explanatory Statement, Division H-Departments of Labor, Health and Human Services, and Education, and Related Agencies Appropriations Act, 2022 at 126 (Mar. 7, 2022), https://docs.house.gov/billsthisweek/20220307/BILLS-117RCP35-JES-DIVISION-H_Part1.pdf.
[31] Bipartisan Safer Communities Act of 2022, Pub. L. No. 117-159, 136 Stat. 1313, 1341 (2022). https://www.congress.gov/117/plaws/publ159/PLAW-117publ159.pdf.
[32] *See, e.g.,* Applications for New Awards; School-Based Mental Health Services Grant Program, 89 Fed. Reg. 15,173 (Mar. 1, 2024); Applications for New Awards; Mental Health Service Professional Demonstration Grant Program, 89 Fed. Reg. 15,180 (Mar. 1, 2024).

proposing to increase the number of credentialed school-based mental health services providers in LEAs with demonstrated need; or (2) LEAs, or a consortia of LEAs, with demonstrated need proposing to increase the number of credentialed school-based mental health services providers.[33] Additionally, the absolute priorities require applicants to either be: (3) "new potential grantees;" or (4) "not new potential grantees."[34] The first competitive priority awards additional points to SEA applicants that propose re-specialization, professional retraining, or other preparation plans for existing mental health service providers to qualify them for work in LEAs with demonstrated need.[35] The second competitive priority gives preference to applicants that propose a plan to increase, in LEAs with demonstrated need, the number of credentialed school-based mental health services providers who are from *diverse* backgrounds or from communities served by the LEAs with demonstrated need.[36]

50. After the first budgeted year, grantees are required under 34 C.F.R. § 75.118 to submit annual performance reports to receive approval for continued funding for the subsequent budget periods of the amounts reflected in the Grant Award Notification.

51. The regulations specify that DOE may consider only a grantee's performance, including performance measures, performance reports, and financial data, when deciding whether the grantee met the requirements to receive a continuation award. *See* 34 C.F.R. § 75.253(b) (2024) (solely identifying "any relevant information regarding grantee performance" as the "[i]nformation considered" when "determining whether the grantee has met the requirements described in paragraph (a)"); Direct Grant Programs, 59 Fed. Reg. 30,258, 30,259 (proposed June 10, 1994) (to be codified at 34 C.F.R. pts. 75, 76, 77, 79, & 299) ("[T]he continuation award decision . . . will be based entirely on the submission of [performance] reports . . . rather than on the submission of a continuation award application."); *see also* U.S. Department of Education, *Discretionary Grantmaking at ED*, at 31–32 (2024) (describing the performance information used by the

[33] Applications for New Awards; School-Based Mental Health Services Grant Program, 89 Fed. Reg. 15,173, 15,174 (Mar. 1, 2024).
[34] *Id.* By definition, all applicants should necessarily satisfy either the third or fourth absolute priority.
[35] *Id.*
[36] *Id.* at 15,175.

Department for its continuation award decision).

### C. Congress and DOE Prioritized Equitable Access to and Participation in MHSP and SBMH Grant-Funded Projects

52. Both Congress and DOE prioritized *equitable access* to and participation in projects funded by the SBMH and MHSP Grant Programs, as reflected in the applicable statutory and regulatory requirements. Section 427 of the General Education Provisions Act ("GEPA"), 20 U.S.C. § 1228a (the "GEPA Equity Directive")—which DOE has recognized applies to applicants for grant awards under the SBMH and MHSP programs—requires applicants to "develop and describe . . . the steps such applicant proposes to take to ensure ***equitable access to, and equitable participation in***, the project or activity to be conducted with such assistance, by addressing the special needs of students, teachers, and other program beneficiaries ***in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age***." (emphasis added).

53. DOE priorities established through statutorily-required rulemaking reflect Congress' intent for the GEPA Equity Directive.[37] The second competitive priority for SBMH gives preference to applicants that propose a plan to increase, in LEAs with demonstrated need, the number of credentialed school-based mental health services providers who are from diverse backgrounds or from communities served by the LEAs with demonstrated need.[38] The MHSP grant program likewise gives competitive preference to applications that increase the number of qualified school based mental health services providers in high-need LEAs who are from diverse backgrounds or from communities served by the high-need LEAs; that promote inclusive practices; or that involve partnerships with Historically Black Colleges and Universities, Tribal Colleges and Universities, or other Minority-Serving Institutions.[39]

54. Other DOE materials provided to grant applicants reiterated these goals. DOE's Grant Competition Stakeholder Resources state that both SBMH and MHSP grants "aim to address

[37] *See* 34 C.F.R. § 75.105 (2024).
[38] Applications for New Awards; School-Based Mental Health Services Grant Program, 89 Fed. Reg. 15,173, 15,175.
[39] *Id.* at 15,176.

student mental health needs by providing … [m]ore providers from diverse backgrounds."[40]

55. The grant application adopted by DOE was designed to achieve these goals as it required applicants to consider how its program would ensure equitable access:

OMB Number: 1894-0005
Expiration Date: 02/28/2026

**NOTICE TO ALL APPLICANTS: EQUITY FOR STUDENTS, EDUCATORS, AND OTHER PROGRAM BENEFICIARIES**

Section 427 of the General Education Provisions Act (GEPA) (20 U.S.C. 1228a) applies to applicants for grant awards under this program.

**ALL APPLICANTS FOR NEW GRANT AWARDS MUST INCLUDE THE FOLLOWING INFORMATION IN THEIR APPLICATIONS TO ADDRESS THIS PROVISION IN ORDER TO RECEIVE FUNDING UNDER THIS PROGRAM.**

Please respond to the following requests for information. Responses are limited to 4,000 characters.

1. Describe how your entity's existing mission, policies, or commitments ensure equitable access to, and equitable participation in, the proposed project or activity.

**Ex. A** at 7.

56. After receiving a grant, the recipient is required to report its success in increasing the diversity of school-based mental health services providers as an authorized SBMH Performance Measure. DOE advised applicants that

> [t]hese measures constitute the Department's indicators of success for this program. Consequently, we advise an applicant for a grant under this program to give careful consideration to these measures in conceptualizing the approach for its proposed project plan. Each grantee will be required to provide, in its annual performance and final reports, data about its progress in meeting these measures. *These data will be considered by the Department in making potential continuation awards*.[41]

In other words, applicants were instructed to highlight their efforts to increase the diversity of

[40] *School Based Mental Health Services (SBMH) Grant Program: FY2024 Grant Competition Stakeholder Resource*, DOE at 3, https://www.ed.gov/sites/ed/files/2024/03/SBMH-Brochure_FY24.pdf (last visited Oct. 21, 2025); *Mental Health Services Professional Demonstration (MHSP) Grant Program: FY2022 Grant Competition Applicant and Stakeholder Resource*, DOE at 3 https://www.ed.gov/sites/ed/files/2022/10/MHSP-Brochure1.pdf (last visited Oct. 21, 2025).

[41] Applications for New Awards; School-Based Mental Health Services Grant Program, 89 Fed. Reg. 15,173, 15,180 (Mar. 1, 2024) (emphasis added).

school-based mental health services providers in their respective school districts.

## IV. MCKINLEYVILLE'S SBMH GRANT

### A. McKinleyville Applies for SBMH Funding as Part of an LEA Consortium

57. On May 31, 2024, McKinleyville applied for SBMH funding on behalf of the NH Consortium. *See generally,* **Ex. A**.

58. McKinleyville reasonably relied on DOE's guidance when submitting its application for the SBMH program grant. McKinleyville proposed a grant project to expand the NH Consortium districts' capacity to hire, train, and retain mental health personnel, thereby reducing student-to-provider ratios and enabling earlier and more effective mental and behavioral health interventions, including preventive interventions before students reach crisis. Over five years, the SBMH grant would enable the NH Consortium districts to expand the continuum of evidence-based practices to respond rapidly to students' mental health needs, increase staff capacity to use trauma-informed practices, ensure that credentialed mental health services providers support a continuum of mental health services at all NH Consortium schools, and make culturally appropriate and trauma-informed support available to all students. *See generally,* **Ex. A**.

59. McKinleyville's application clearly met the absolute priorities for SBMH program grants and highlighted the applicable competitive preference priority. McKinleyville's application: identified the NH Consortium as LEAs with demonstrated need to be served by the proposed project; described how each LEA in the proposed consortium meets the definition of an LEA with demonstrated need; described the importance and magnitude of the problem; described its approach to increasing the number of credentialed school-based mental health services providers using a logic model (as defined in 34 C.F.R. § 77.1); provided a detailed project budget, number of providers, and a plan for prompt delivery of services to students; and provided a plan for collaboration and coordination with related Federal, State, and local organizations.[42] *See generally,* **Ex. A**.

[42] Applications for New Awards; School-Based Mental Health Services Grant Program, 89 Fed. Reg. 15,173, 15,175–76 (Mar. 1, 2024).

60.    McKinleyville's grant application also confirmed it complied with GEPA's Equity Directive: "Through a combination of outreach, community engagement, resource allocation, and professional development initiatives, NH is dedicated to addressing the unique needs of rural communities and ensuring that all students have the opportunity to thrive." **Ex. A** at 7.

61.    The grant was to fund: the equivalent of six full-time credentialed mental health service providers—such as school social workers, school psychologists, or school counselors—to deliver a broad range of direct services to students and host placements for graduate student interns; the equivalent of three full-time Multi-Tiered System of Supports ("MTSS") Instructional Coaches to train, coach, and guide the implementation of MTSS strategies across each LEA, while developing and delivering appropriate supports for students; and one full-time Project Director to provide overall leadership and strategic oversight. *See generally,* **Ex. A**.

62.    Of those personnel, McKinleyville would directly hire three credentialed mental health service providers, one MTSS coach, and the Project Director.  McKinleyville would subcontract with the other NH Consortium districts, enabling Arcata to hire two mental health services providers and one MTSS Instructional Coach and Pacific Union to hire one mental health services provider and one MTSS Instructional Coach.

63.    To develop a mental health staff that is reflective of and invested in Humboldt communities, McKinleyville also proposed using grant funding to provide stipends for its current classified (i.e., paraprofessional) employees to pursue behavioral health credentialing and move into specialist positions.  McKinleyville proposed using grant money to host paid internships for twelve local Bachelor of Arts in Social Work ("BASW") and Master of Social Work ("MSW") interns over the course of five years, increasing districts' capacity while addressing the financial barrier to training for persons who come from socioeconomically disadvantaged backgrounds. *See generally,* **Ex. A**.  In addition, the SBMH program grant would support staff retention by funding professional support, competitive salaries, and ongoing training opportunities for credentialed staff.

### B.    DOE Awards McKinleyville an SBMH Grant and NH Consortium Districts Begin Implementation

64.    On October 17, 2024, DOE sent McKinleyville Grant Award Notification for the

five-year period from January 1, 2025 through December 31, 2029.  **Ex. B** at 3.

| BUDGET PERIOD | DATE | AMOUNT |
|---|---|---|
| 1 | 01/01/2025-12/31/2025 | $1,289,075.00 |
| 2 | 01/01/2026-12/31/2026 | $1,389,270.00 |
| 3 | 01/01/2027-12/31/2027 | $1,445,929.00 |
| 4 | 01/01/2028-12/31/2028 | $1,494,080.00 |
| 5 | 01/01/2029-12/31/2029 | $1,533,873.00 |

65.    Like the other NH Consortium districts, McKinleyville reasonably expected multi-year funding of its SBMH program because Defendants lacked discretion to deny a continuation award for any reason other than poor performance.  In addition, the Grant Award Notification assured McKinleyville that "The Secretary anticipates future funding for this award according to the schedule identified in block 6."  **Ex. B** at 4.

66.    The Grant Award Notification is consistent with DOE's public description of its exercise of discretion in continuing multi-year grant awards.  When proposing an amendment in 2024 to allow a request for reconsideration when a non-competitive continuation award has been denied, DOE reassured grant recipients that it generally does not "deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance and often cite no concerns if they do not receive a continuation award."[43]  DOE estimated that it would receive approximately ten requests for review of non-continuation awards per year, which DOE then believed "is an overestimate of the likely incidence" due to the low number of denials of continuation awards.[44]

67.    After receiving the grant, McKinleyville structured its budget with the understanding that it would have several years to generate performance results and build relationships with new funding sources.  McKinleyville's reliance is based on, among other things, Defendants' history and practice under the SBMH program, Defendants' regulations showing Defendants' "intention to make continuation awards to fund the remainder of the project period" upon approval of multi-year grants, 34 C.F.R. § 75.251(b)(2) (2013), and Defendants' prioritization of "continuation awards over new grants," 34 C.F.R. § 75.253(c) (2024).  *See also, e.g.*, Direct

---

[43] Education Department General Administrative Regulations and Related Regulatory Provisions, 89 Fed. Reg. 1982, 2002 (Jan. 11, 2024).
[44] *Id.*

Grant Programs, 59 Fed. Reg. 30,258, 30,259 (proposed June 10, 1994) (to be codified at 34 C.F.R. pts. 75, 76, 77, 79, & 299) (explaining that a cut-off in continuation award funding is "extremely rare in practice"); Education Department General Administrative Regulations and Related Regulatory Provisions, 89 Fed. Reg. 70,300, 70,316 (Aug. 29, 2024) (to be codified at 34 C.F.R. pts. 75, 76, 77, 79, & 299) (repeating its prior statement that "[i]n general, [DOE] do[es] not deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance").

68. In the first months of 2025, McKinleyville began grant implementation. The District hired a new school psychologist and school social worker, both of whom expected their master's degrees from the nearby California State Polytechnic University, Humboldt in spring 2025. McKinleyville also selected a Teacher on Special Assignment to transition from classroom teaching to the role of MTSS instructional coach. In addition, the District approached current classified (i.e., paraprofessional) employees to offer grant funding to pursue advanced mental health certification.[45]

## V. DEFENDANTS' UNLAWFUL NON-CONTINUATION DECISION

### A. DOE Sends Boilerplate Notices of Non-Continuation

69. On April 29, 2025, DOE notified the majority of MHSP and SBMH grantees across the country, including McKinleyville, that their grants would not be continued at the end of the current grant budget period—that is, after December 31, 2025. *See* **Ex. C** at 1; **Ex. B** at 3–4.

70. Defendants communicated the non-continuation to grantees through a two-page boilerplate letter, using stock language, stating in conclusory fashion that the non-continued grant "reflect[s] the prior Administration's priorities and policy preferences and conflict[s] with those of the current Administration" and "no longer effectuates[] the best interest of the Federal Government and will not be continued." *See* **Ex. C** at 1.

71. The Non-Continuation Decision provides no information regarding the change in

[45] Arcata and Pacific Union also made hiring decisions in reliance on grant funding. After the award notification, Arcata brought back two mental health services providers—a school-based social worker and a school psychologist. Pacific Union hired its first full-time school psychologist. And both districts selected a Teacher On Special Assignment to transition from classroom teaching to the MTSS instructional coach role.

the government's "best interest" and no information about or analysis of how McKinleyville's specific SBMH programs are inconsistent with that interest. *See generally*, **Ex. C**. It simply states:

> The Department has undertaken a review of grants and determined that the grant specified above provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflict with those of the current Administration, in that the programs: violate the letter or purpose of Federal civil rights law; conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; undermine the well-being of the students these programs are intended to help; or constitute an inappropriate use of federal funds. The grant is therefore inconsistent with, and no longer effectuates, the best interest of the Federal Government and will not be continued.

**Ex. C** at 1.

72.    DOE did not provide McKinleyville with any prior process or communication about the Non-Continuation Decision.

73.    DOE's Non-Continuation Decision said nothing about McKinleyville's performance under the grant. Indeed, McKinleyville has not yet submitted any performance report or performance data to Defendants. When DOE sent the Non-Continuation Decision, McKinleyville's first annual performance report was not even due until February 2026—after the completion of the first budgeted year—and its first interim report was not due until October 30, 2025.

**B.    DOE's Agency Actions that Led to the Non-Continuation Decision Were Unlawful.**

74.    As described above, DOE's decision whether to continue a grant must be based entirely on a grantee's performance. *Supra* at ¶¶ 8, 51. Because the date for McKinleyville to submit any performance data or reports to DOE had not yet occurred, DOE's Non-Continuation Decision could not have been and *was not* based on the required assessment of McKinleyville's performance.

75.    Rather, Defendants' public statements—including Defendant McMahon's testimony before the Senate Appropriations Subcommittee—as well as DOE internal directives and notices, confirm that the Non-Continuation Decision was based on impermissible factors that conflict with the statutory purposes and authorized regulations, including the current Administration's focus on "DEI" and "gender issues." *See* **Ex. G** at 67.

76.    Indeed, DOE's policy and directive changes confirm its affirmative decision to

ignore statutory and regulatory requirements.  On February 5, 2025, DOE's Office of Planning, Evaluation, and Policy Development issued a Directive on Department Grant Priorities ("DOE Directive"), purportedly "to eliminate discrimination in all forms of education."[46]  The DOE Directive asserts that DEI initiatives "unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic" and "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education."[47]  It further instructed DOE personnel to review existing grants to ensure they "do not fund discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives[.]"[48]

77.    Following issuance of the Non-Continuation Decisions, DOE publicly stated:

> The Department [of Education] decided not to continue funding these grants beyond the initial award terms. These grants are intended to improve American students' mental health by funding additional mental health professionals in schools and on campuses. . . Instead, under the deeply flawed priorities of the Biden Administration, grant recipients used the funding to implement *race-based actions* like recruiting quotas in ways that have nothing to do with mental health and could hurt the very students the grants are supposed to help.[49]

78.    DOE's decision to discontinue funding for the SBMH and MPSH programs as of December 31, 2025 caused widespread public and Congressional backlash.  During the Senate Appropriations hearing for the Subcommittee on Labor, Health and Human Services, Education and Related Agencies on the Fiscal Year 2026 DOE Budget Request, senators pressed Defendant McMahon on the rationale for discontinuing these vital programs.  Senator Christopher Murphy asked, "How did you weigh the impact [of discontinuing the grant programs] on those kids?"  **Ex. G** at 67.  In response, Defendant McMahon stated, "[T]here were programs in the mental health

---

[46] Prem Thakker (@prem_thakker), X.com (Feb. 5, 2025), https://x.com/prem_thakker/status/1887261853350318163?s=46 (posting Directive on Development Grant Priorities ("DOE Directive"), U.S. Dept. of Educ. (Feb. 5, 2025) at 1); *see also Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, 770 F.Supp.3d 822, 837 n.3 (D. Md. 2025) (noting that "***the Directive was made public by way of a social media post***" – that is, "it was leaked"—and that "the Directive was offered by Defendants as an exhibit" without challenge to its authenticity) (emphasis added).

[47] DOE Directive at 1.

[48] *Id.*

[49] Breccan F. Thies, *Education Department Cuts $1B In 'Mental Health' Grants Used To Advance DEI*, The Federalist (April 30, 2025), https://thefederalist.com/2025/04/30/education-department-cuts-1b-in-mental-health-grants-used-to-advance-dei/ (emphasis added)

program that did deal with DEI and with and with gender issues," *see* **Ex. G** at 67, as the purported (and unlawful) justification for DOE's non-continuation of grants approved under the SBMH and MHSP programs.

79.    Both DOE's "official" reason for not continuing the grants—summarily stated in the Non-Continuation Decision—and its later publicly articulated reasons for discontinuing the grants across the country due to "DEI" and "gender issues" are unlawful.  The grants were not discontinued because they violated the terms of the grant applications or grant approvals, nor because they strayed from the subject matter or purpose for which they were funded.  Rather, the grants were discontinued because a purpose expressly authorized by Congress and implemented through the required rulemaking process is not supported by the current Administration.  The Non-Continuation Decision replaced Congress's mandate with new policies that directly contradict the grant priorities on which McKinleyville detrimentally relied.

80.    As detailed in the Notice of Funding Application, and consistent with the GEPA Equity Directive, DOE encouraged grantees to design and implement programs to increase representation of mental health professionals from underrepresented communities.[50]   Now, however, McKinleyville is being punished for implementing those approved programs, abruptly upending years of planning.  Defendants do not acknowledge—let alone provide good reasons for—any official change in agency policy or *why* the agency changed its view of how the grant serves statutory priorities.

81.    In light of Defendants' unlawful actions, McKinleyville promptly sought reconsideration of the Non-Continuation Decision.  *See* **Ex. D**.  However, by letter dated September 12, 2025, Defendants reiterated their prior unlawful decision, stating:

> Upon review of your submitted reconsideration materials and documentation from your grant, I have determined that your grant provides funding for programs that reflect the prior Administration's priorities and policy preferences and conflicts with those of the current Administration, in that the program: violates the letter or purpose

---

[50] *See* Applications for New Awards; School-Based Mental Health Services Grant Program, 89 Fed. Reg. 15,173, 15,175 (Mar. 1, 2024)(stating that the priorities for the grant competition are intended to, among other things, "increase the diversity . . . of school-based mental health services providers" and specifying that to meet one of the two competitive preference priorities, "applicants must propose a plan to increase the number of credentialed school-based mental health services providers in LEAs with demonstrated need who are from diverse backgrounds or who are from communities served by the LEAs with demonstrated need").

> of Federal civil rights law; conflicts with the Department's policy of prioritizing merit, fairness, and excellence in education; undermines the well-being of the students these programs are intended to help; or constitutes an inappropriate use of federal funds.
>
> Specifically, in support of my conclusion, you state in your approved grant application on page e26 that your "hiring qualifications will stress [membership in a racial group]" and that your "credentialed workforce is 88% white" (page e25). You project goal is "Diversity of…Providers: 50%." In addition, the information in your request for reconsideration was not sufficient to refute these findings.

**Ex. E** at 1. This letter further underscored that the Non-Continuation Decision was not based on any assessment of McKinleyville's grant performance, ignored statutory and regulatory requirements, and penalized McKinleyville for submitting information about diversity that the grant application required McKinleyville to submit.[51]

82. DOE's invitation for new applications for SBMH Grant Program funding, noticed on September 29, 2025, does not remedy Defendants' procedural violations.[52] Nor can McKinleyville obtain new SBMH funding, as the District does not meet DOE's new definition of a "high-need LEA." *See* Applications for New Awards; School-Based Mental Health Services Grant Program, 90 Fed. Reg. 46,573, 46,576 (Sept. 29, 2025). And even if McKinleyville were eligible for funding, the SBMH Grant Program is significantly changed. New grants will not support hiring school counselors or school social workers; and while McKinleyville had expected to receive over $5,000,000 in SBMH funding over the next four years, *see* **Ex. B** at 3, DOE's estimated maximum award for the current application cycle is only $1,750,000 over four years.[53]

## VI. MCKINLEYVILLE FACES IRREPARABLE HARM FROM THE UNLAWFUL NON-CONTINUATION OF ITS GRANT

83. McKinleyville reasonably expected four additional years of SBMH funding after December 31, 2025. *See* **Ex. B** at 3 (providing grant award for five-year period from January 1, 2025 through December 31, 2029). However, upon receiving the Non-Continuation Decision,

---

[51] *See* Applications for New Awards; School-Based Mental Health Services Grant Program, 89 Fed. Reg. 15,173, 15,179–80 (Mar. 1, 2024) (establishing as a grant performance measure, "[f]or grantees that addressed Competitive Preference Priority 2, the number of such grantees that met their goal of increasing the diversity of school-based mental health services providers.").

[52] *See* Applications for New Awards; School-Based Mental Health Services Grant Program, 90 Fed. Reg. 46,573 (Sept. 29, 2025).

[53] *Id.* at 46,574.

McKinleyville's progress toward building mental health capacity in the district has functionally ended. Even though McKinleyville has funding through December 2025, it reasonably relied on funding through 2029 and designed its grant initiatives to take place over multiple years. Absent the Court's intervention, the Non-Continuation Decision will require McKinleyville to scale back its previous staffing and program development plans.

84.    Instead of hiring mental health staff for the five-year award period, McKinleyville hired its new school psychologist and school social worker in temporary positions. Because SBMH funding will end in December 2025, McKinleyville must now reallocate funds just to keep new staff in their roles through the end of the 2025–26 school year. Without additional funding, McKinleyville cannot sustain these new positions beyond the current school year, and the District will have to provide layoff notices to these staff by March 15, 2026.

85.    McKinleyville's grant-funded Teacher on Special Assignment who works with classroom teachers to implement a Multi-Tiered System of Supports, will have to return to classroom teaching at the end of the 2025–26 academic year.

86.    McKinleyville's Project Coordinator, tasked with overseeing the grant project at six schools across three districts, will also lose her grant-funded employment in 2026.

87.    McKinleyville also had to rescind offers to help current staff obtain specialized degrees and certifications, and it can no longer pay staff to supervise graduate-level mental health interns in its schools. In addition, McKinleyville must abandon its plan to invest in developing in-house trainers to help staff learn safe crisis intervention strategies and instead resort to sending fewer staff to one-time trainings.

88.    Without the SBMH funding, McKinleyville and its partner districts cannot offer mental health services crucial for children's academic achievement, psychological wellbeing, and physical safety. Teachers will lose invaluable support in managing classroom behaviors and addressing learning challenges. McKinleyville will subsequently lose teachers due to burnout, jeopardizing the quality of education that the District can provide its students. And students, including tribal members, will lose connections with qualified mental health staff who are, in some cases, the only trusted adults in their lives.

89. Defendants' actions have disrupted critical services that ensure student learning and safety. Such disruptions can damage students' future relationships with mental health providers, causing them to withdraw and straining the school district's limited resources. With fewer mental health providers, there is a high risk of surges in students' externalized behaviors, such as disruptive conduct, verbal and physical aggression, and delinquent activities that precipitate criminal activity, as well as internalized behaviors, such as school avoidance, substance use, self-harm, and suicidality.

## CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A) (ARBITRARY AND CAPRICIOUS)

90. McKinleyville repeats and incorporates by reference each of the allegations of the prior paragraphs as if fully set forth herein.

91. Under the APA, a "court shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

92. DOE is an "agency" under the APA, 5 U.S.C. § 551(1), and the Defendants' Non-Continuation Decision is an agency action subject to review under the APA.

93. An agency action is arbitrary and capricious if the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider factors that Congress (and the implementing regulations) directed it to consider, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

94. The Non-Continuation Decision sent to McKinleyville is a final agency action because it announces a final decision "not to continue [the District's] federal award, S184H240363, in its entirety, effective at the end of [the] current grant budget period." **Ex. C** at 1; *see also* **Ex. E** at 2 ("[T]his determination represents the final decision of the Department"). It further requires McKinleyville to discharge any "closeout responsibilities set forth in 2 C.F.R. § 200.344-46 and

[the] award agreement." **Ex. C** at 2. Additionally, it requires McKinleyville to "submit all final reports" and "promptly refund any unobligated funds." *Id.* FAQs published by DOE for the SBMH program grant make clear that the "Notices of Non-Continuation" must be abided by, with no leeway for accommodating already made job offers or sustaining ongoing programming that extend beyond the end of the current grant budget period. *See* **Ex. F** at 2. The Non-Continuation Decision immediately produced legal consequences for McKinleyville because it will no longer have access to previously awarded funds for 2026 and succeeding years.

95.    The Non-Continuation Decision is arbitrary and capricious because it: (1) fails to assess the sole factor identified in regulations as a basis for grant continuation, namely, McKinleyville's performance of grant requirements; (2) does not provide any indication of reasoned consideration; (3) fails to consider reliance interests to inform the agency action; (4) relies on factors that Congress has expressly not intended that Defendants consider; (5) does not explain the reversal of course from "the prior Administration's priorities and policy preferences"; and (6) fails to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives. *See generally* **Ex. C**.

96.    First, Defendants' Non-Continuation Decision does not appear to have included any consideration of McKinleyville's grant performance—a direct violation of DOE regulations requiring that continuation decisions be based exclusively on grantee performance. *See* 34 C.F.R. § 75.105 (2024) (providing for the Secretary to establish priorities to inform grantee selection); 34 C.F.R. § 75.253(b) (2024) (specifying that the Secretary considers grantee performance in making a continuation award).

97.    Second, the Non-Continuation Decision does not provide any indication that DOE engaged in reasoned consideration of any individual project before deciding to discontinue the McKinleyville SBMH grant.

98.    Third, the Non-Continuation Decision fails to consider relevant matters, including, at minimum: (1) how McKinleyville reasonably relied on DOE's published regulations and guidance when submitting its application for the SBMH program grant; (2) whether affected SBMH program grant projects could be adjusted, rather than discontinued, to comply with the new "best

interest of the Federal Government" (assuming that unspecified interest is otherwise lawful); (3) whether Defendants could have adopted a measure other than across-the-board discontinuation of entire categories of grants to effectuate their new "priorities" (assuming those new "priorities" were otherwise lawful); and (4) the harm that discontinuing the grant would inflict on students and mental health professionals currently being served through the SBMH program grant. The Non-Continuation Decision has far-reaching and catastrophic consequences. McKinleyville, for example, now needs to terminate its contracts with mental health support professionals and cut mental health services for the students the grant funds were intended to help. Defendants' actions completely fail to consider these direct and obvious consequences, which is arbitrary and capricious.

99.    Fourth, as confirmed by Defendants' public statements, the decision to discontinue McKinleyville's SBMH grant funding was based on factors that Congress has expressly not intended that Defendants consider, including considerations in conflict with pre-existing directives for these specific grant programs relating to diversity. *Compare* 20 U.S.C. § 1228a(b) (requiring that a grant applicant "develop and describe," in its application, "the steps such applicant proposes to take to ensure equitable access to, and equitable participation in, the project or activity . . . in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age"), Equity For Students, Teachers, And Other Program Beneficiaries (OMB Control No. 1894-0005) (requiring applicants to "address" § 1228a "in order to receive funding under this program"), and Applications for New Awards; School-Based Mental Health Services Grant Program, 89 Fed. Reg. 15,173, 15,173–75 (Mar. 1, 2024) (listing diversity as one of the priorities for awarding grants) *with* **Ex. E** at 1 (suggesting that the goal of diversifying providers was the basis for discontinuing the grant).

100.    Fifth, the Non-Continuation Decision does not explain the reversal of course from "the prior Administration's priorities and policy preferences[.]"  **Ex. C** at 1.  McKinleyville cannot be penalized for complying with government requirements no longer supported by the current Administration.

101.    Finally, the Non-Continuation Decision also entirely fails to consider reasonable

alternatives to its chosen policy and to provide a reasoned explanation for its rejection of such alternatives.

102. McKinleyville therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Non-Continuation Decision violates the APA because it is arbitrary and capricious; set aside the Non-Continuation Decision under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from implementing or enforcing the Non-Continuation Decision or taking any similar action based on the same or similar rationale to discontinue funding for the affected McKinleyville SBMH grant.

**COUNT TWO**
**SUBSTANTIVE VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)(A), (C)**
**(IN EXCESS OF STATUTORY AUTHORITY AND CONTRARY TO LAW)**

103. McKinleyville repeats and incorporates by reference each of the allegations of the prior paragraphs as if fully set forth herein.

104. Under the APA, a court must "set aside" agency action "not in accordance with law[,]" 5 U.S.C. § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

105. Because Defendants are creatures of statutes and possess only the authority that Congress has provided, they may exercise only authority granted to them by statute.

106. In addition, the APA, as a general matter, forbids retroactive rulemaking.

107. In reviewing agency action, a court cannot accept the agency's policy judgments if they conflict with the policy judgments that undergird the statutory scheme.

108. Defendants discontinued McKinleyville's SBMH grant through the Non-Continuation Decision, stating that it "no longer effectuates[] the best interest of the Federal Government[,]" **Ex. C** at 1, because, according to Defendants, such grants "deal with DEI and . . . with gender issues." *See* **Ex. G** at 67.

109. The Non-Continuation Decision is contrary to law because it violates DOE regulations addressing continuation funding for multi-year grant awards. *See* 34 C.F.R. § 75.253 (2024).

110.    When considering whether a grantee has fulfilled the requirements to receive a continuation award, Defendants look to "any relevant information regarding grantee performance." 34 C.F.R. § 75.253(b) (2024); *see* Direct Grant Programs, 59 Fed. Reg. 30,258, 30,259 (proposed June 10, 1994) (to be codified at 34 C.F.R. pts. 75, 76, 77, 79, & 299) ("[T]he continuation award decision—including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of [performance] reports as specified by the Secretary, rather than on the submission of a continuation award application."); *see also, e.g.*, *Discretionary Grantmaking at ED*, DOE at 32 (2024),   https://www.ed.gov/media/document/grantmaking-ed-108713.pdf (suggesting that a grantee's performance is used to determine whether § 75.253(a) requirements, including the requirement that "continuation of the project is in the best interest of the Federal Government," are met).  However, Defendants did not base their continuation award decision on McKinleyville's performance.  *See generally* **Ex. C.**

111.    Instead, Defendants based their Non-Continuation Decision on new priorities that conflict with the original grant priorities on which McKinleyville relied when planning its program. In doing so, Defendants exceeded their regulatory authority, *see* 34 C.F.R. § 75.253(b) (2024), to the detriment of McKinleyville, which expected that the continuation decision would be based on its performance under original grant priorities.  *See, e.g.*, 34 C.F.R. § 75.118 (2024) (requiring submission of performance report to receive a continuation award); Direct Grant Programs, 59 Fed. Reg. 30,258, 30,259 (proposed June 10, 1994) (to be codified at 34 C.F.R. pts. 75, 76, 77, 79, & 299) (explaining that "[t]he performance report . . . will provide the information on which the funding decision will be made").

112.    By law, grant program priorities are subject to the notice and comment process, and they must be established when publishing the application notice for new grants.  34 C.F.R. § 75.105(b) (2024).  Grant program priorities for existing grants cannot be changed after a multi-year grant has been awarded.  *See, e.g.*, 34 C.F.R. § 75.100(a) (1994) ("Each fiscal year, the Secretary publishes application notices . . . *for new grants*[.]" (emphasis added)); 34 C.F.R. § 75.101(a)(4) (2024) (application notice includes "[a]ny priorities established by the Secretary for the program for that year"); 34 C.F.R. § 75.105(a) (2024) (describing process for establishing

"priorities for selection of applications in a particular fiscal year"). Continuation awards do not go through the same application process where priorities can be re-established. Rather, continuation awards are solely based on the performance of the grantee. *See* 34 C.F.R. § 75.253(b) (2024) (providing that the Secretary should consider grantee performance in making a continuation award); 34 C.F.R. § 75.118 (2024) (requiring submission of performance report to receive a continuation award); Direct Grant Programs, 59 Fed. Reg. 30,258, 30,259 (proposed June 10, 1994) (to be codified at 34 C.F.R. pts. 75, 76, 77, 79, & 299) ("[T]he continuation award decision—including the decision about whether the grantee has made substantial progress—will be based entirely on the submission of [performance] reports as specified by the Secretary, rather than on the submission of a continuation award application.").

113. The Non-Continuation Decision, as part of a mass non-continuation of previously awarded grants, and DOE's subsequent attempt to re-compete SBMH grant program funding unlawfully circumvent the priority that federal law assigns to continuation awards as opposed to new grants. 34 C.F.R. § 75.253(c) (2024); *see, e.g.*, Direct Grant Programs, 45 Fed. Reg. 22,552, 22,559 (proposed Apr. 3, 1980) (explaining that each "continuation award will be judged on the basis of the criteria in [§ 253(a)] and *will not be subject to competition with other applications*" (emphasis added)).

114. The Non-Continuation Decision is also contrary to law and beyond statutory authority because it defies Congress's GEPA directive requiring that applicants explain the steps they will take "to ensure equitable access to, and equitable participation in, the project or activity" funded by the grant "in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age."[54] To the extent that Defendants discontinued McKinleyville's SBMH grant because it "deal[s] with [diversity, equity, and inclusion] and [] with gender issues," the Non-Continuation Decision contravenes Congress's GEPA Equity Directive in 20 U.S.C. § 1228a(b); *see also* **Ex. E** at 1 (suggesting that the goal of diversifying providers was the basis for discontinuing the grant).

115. Defendants have no authority to withhold funding from McKinleyville without

[54] 20 U.S.C. § 1228a(b).

considering the statutes, regulations, and terms governing each source of funding.

116. McKinleyville therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Non-Continuation Decision violates the APA because it exceeds statutory jurisdiction, authority, or limitations, or short of statutory right; set aside the Non-Continuation Decision under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from implementing or enforcing the Non-Continuation Decision or taking any similar action based on the same or similar rationale to discontinue funding for the affected SBMH program grant.

**COUNT THREE**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT,**
**5 U.S.C. § 706(2)(B)**
**(CONTRARY TO CONSTITUTION)**

117. McKinleyville repeats and incorporates by reference each of the allegations of the prior paragraphs as if fully set forth herein.

118. Under the APA, a court must "set aside" agency action "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

119. As further detailed herein, the Non-Continuation Decision violates the Spending Clause, the Take Care Clause, and the Due Process Clause, bedrock provisions of the U.S. Constitution. McKinleyville therefore asks the Court to declare under 5 U.S.C. § 706 and 28 U.S.C. § 2201 that the Non-Continuation Decision violates the APA because it is contrary to law and exceeds statutory jurisdiction, authority, or limitations, or short of statutory right; set aside the Non-Continuation Decision under 5 U.S.C. § 706; provide preliminary relief under 5 U.S.C. § 705; and preliminarily and permanently enjoin Defendants from implementing or enforcing the Non-Continuation Decision or taking any similar action based on the same or similar rationale to discontinue the funding for the affected SBMH program grant.

**COUNT FOUR**
**DUE PROCESS CLAUSE – VOID FOR VAGUENESS**

120. McKinleyville repeats and incorporates by reference each of the allegations of the prior paragraphs as if fully set forth herein.

121.    The Due Process Clause of the Fifth Amendment to the Constitution requires due process of law before the deprivation of a constitutionally protected interest.

122.    McKinleyville has a constitutionally protected property interest in grant funding that supports their salaries and stipends, as well as their ongoing mental health-based programming for its consortium.  McKinleyville has relied on this funding, and federal law governing this funding, in its development of mental health-based programs, hiring decisions, among other efforts and investments.

123.    Defendants' non-continuation of federal grant funding failed to provide McKinleyville fair notice or a reasonable opportunity to be heard, and is unconstitutionally vague.

124.    The Due Process Clause prohibits government actions that fail to give fair notice of what conduct is forbidden or required.  A government enactment is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited or is so indefinite as to allow arbitrary and discriminatory enforcement.

125.    Defendants' Non-Continuation Decision failed to provide McKinleyville with fair notice.  The Non-Continuation Decision was not tied to or based on any actions by McKinleyville, such as a violation of the grant terms or poor performance metrics.  The Non-Continuation Decision does not reflect any individualized assessment or analysis of McKinleyville's programs.  Rather, Defendants communicated the non-continuation to McKinleyville through a two-page boilerplate letter, using stock language, that states in conclusory fashion that the non-continued grant "reflect[s] the prior Administration's priorities and policy preferences and conflict[s] with those of the current Administration" and "no longer effectuates[] the best interest of the Federal Government and will not be continued."  *See* **Ex. C** at 1.

126.    The Non-Continuation Decision is also unconstitutionally vague because it provides no information regarding the change in the government's "best interest" nor how McKinleyville's specific SBMH programs are inconsistent with that interest.  Because of the vagueness in the language of Defendants' Non-Continuation Decision and chaotic efforts to implement the current Administration's political viewpoint, McKinleyville had no way of conforming its conduct to avoid the non-continuation of its grant.

127. Defendants' efforts to purge certain disfavored viewpoints from federal agencies' grant programs accordingly violate the Due Process Clause.

128. For the foregoing reasons, McKinleyville is entitled to a preliminary and permanent injunction barring Defendants from implementing, maintaining, or reinstating the Non-Continuation Decision based on the same or similar rationale, and to a declaration pursuant to 28 U.S.C. § 2201 declaring unconstitutional the reasoning behind the Non-Continuation Decision and any action taken to enforce or implement it.

**COUNT FIVE**
***ULTRA VIRES* ACTIONS; VIOLATION OF THE SPENDING CLAUSE**

129. McKinleyville repeats and incorporates by reference each of the allegations of the prior paragraphs as if fully set forth herein.

130. The Spending Clause of the U.S. Constitution, Article I, Section 8, Clause 1, provides that Congress—not the Executive—"shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ."

131. The Spending Clause requires grant conditions to be (1) set forth unambiguously (2) *before* a recipient enters into the grant agreement with the federal government, and (3) related to the subject matter of the grant program. The government cannot implement new conditions after-the-fact because recipients must decide to opt-in to a federal program willingly and aware of the conditions.

132. Here, Defendants retroactively changed the conditions of McKinleyville's grant agreement after the grant was awarded. McKinleyville previously received the required notice of applicable conditions for the grant award because DOE published priorities, requirements, and definitions in the Federal Register. *See* Applications for New Awards; School-Based Mental Health Services Grant Program, 89 Fed. Reg. 15,173 (Mar. 1, 2024). McKinleyville accepted the grant award with the understanding of what conditions it would be held to and evaluated against. McKinleyville and those intended to benefit from the grant relied on Defendants' representations that they would prioritize continuation awards over new grant awards – and that continuation

awards would solely consider McKinleyville's grant performance and would not alter the grant conditions. *See* 34 C.F.R. § 75.253(c) (2024). Thereafter, McKinleyville budgeted for, implemented, and participated in projects that fulfilled these conditions while achieving the goals set forth in the grant application. Disregarding the parties' mutual understanding and McKinleyville's reliance thereon, Defendants issued new priorities and conditions in the Non-Continuation Decision and decided, without any factual support, that McKinleyville did not satisfy the new requirements.

133. The Non-Continuation Decision unilaterally altered McKinleyville's grant conditions and replaced them with unconstitutionally ambiguous conditions. Defendants communicated this decision through a two-page boilerplate letter, using stock language, stating in conclusory fashion that each non-continued SBMH program grant "no longer effectuates[] the best interest of the Federal Government" given its perceived connection with certain subject matters (e.g., "DEI" or "gender issues"). Defendants stated that the current Administration's priorities and preferences included "prioritizing merit, fairness, and excellence in education" without explaining the requirements to satisfy those conditions nor why McKinleyville failed to do so.

134. The Non-Continuation Decision sent to McKinleyville does not reflect any review of McKinleyville's programs at all, much less any analysis of how its programs were inconsistent with the government's best interest, priorities, or policy preferences. Nor could it show as such. At the time DOE sent the Non-Continuation Decision, McKinleyville's first performance report was not due until October 30, 2025.[55] Moreover, Congress expressly directed grant recipients to outline how their programs help "overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age."[56] McKinleyville not only followed these directives but also relied on these factors to design a program to spend the grant funds. The Non-Continuation Decision fails to explain the reversal of course or why McKinleyville failed to perform as required under the grant requirements.

135. The Non-Continuation Decision is not related to the federal interest in SBMH

[55] As of filing, McKinleyville's first (and only) performance report is due 120 days after grant termination on December 31, 2025.

[56] 20 U.S.C. § 1228a(b).

programs—to support mental health and well-being of students. Indeed, the effect of the Non-Continuation Decision is to eliminate mental health support programming.

136. The Non-Continuation Decision is retroactive, ambiguous, and inconsistent with the purpose of the programs, GEPA's Equity Directive that grant recipients address "equitable access"[57] and the final rulemaking priorities governing the programs issued pursuant to GEPA and 34 C.F.R. § 75.105(b).

137. The Non-Continuation Decision has caused and is causing substantial injury, including immediate and irreparable harm.

138. For the foregoing reasons, McKinleyville is entitled to a preliminary and permanent injunction barring Defendants from implementing, maintaining, or reinstating the Non-Continuation Decision based on the same or similar rationale, and to a declaration pursuant to 28 U.S.C. § 2201 declaring unconstitutional the reasoning behind the Non-Continuation Decision and any action taken to enforce or implement it.

## COUNT SIX
## *ULTRA VIRES* ACTIONS –
## SEPARATION OF POWERS VIOLATION

139. McKinleyville repeats and incorporates by reference each of the allegations of the prior paragraphs as if fully set forth herein.

140. Congress possesses exclusive power to legislate. Article I, Section 1 of the Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. art. I, §1.

141. The Executive Branch violates the Take Care Clause where it declines to execute or otherwise undermines statutes enacted by Congress and signed into law or duly promulgated regulations implementing such statutes, and where it attempts unilaterally to amend, cancel, undermine, or otherwise decline to execute duly enacted Congressional appropriations.

142. Congress has made certain funds available for the purposes of carrying out the SBMH program for each of fiscal years 2022 through 2026. DOE has no authority unilaterally to

[57] *See id.*

amend the purpose of this appropriation.

143. In the Non-Continuation Decision, Defendants cited the current Administration's policies and priorities as the authority for its actions. By doing so, Defendants disregarded Congress's GEPA Equity Directive, congressional oversight, and established regulations in violation of the separation of powers principles and the Take Care Clause.

144. Since 1994, Congress's GEPA Equity Directive has required that any applicant for grant funding, including applicants for the SBMH program grant at issue here, ensure equitable access and equitable participation in a project or activity receiving assistance by addressing program beneficiaries' needs to overcome barriers, including those "based on gender, race, color, national origin, disability, and age."[58] Congress established these requirements to achieve "equal access to education and to promote educational excellence throughout the Nation."[59] The Non-Continuation Decision not only contradicts Congress's GEPA Equity Directive, but undermines its objectives in violation of the Take Care Clause.

145. Defendants' pattern and policy of systematic non-continuations—as reflected in the *en masse* Non-Continuation Decisions sent to SBMH program grant recipients—violates the separation of powers constraints described above. Defendants' non-continuation of McKinleyville's SBMH program grant for being in "conflict" with this "Administration's priorities and policy preferences," **Ex. C** at 1, is accordingly an unlawful infringement upon Congress's power to appropriate public funds for specific purposes and a violation of the executive branch's obligation to administer the law in a manner consistent with Congressional appropriation. Through these actions, Defendants have unlawfully overridden the careful judgments of Congress by refusing to disburse duly appropriated funding in the manner mandated by Congress.

146. The discontinuation of the McKinleyville SBMH grant is also contrary to the principle that any funding restriction must reasonably relate to the federal interest in the project and the project's objectives. Here, the Non-Continuation Decision is not related to the federal interest in SBMH programs—to support mental health and well-being of students—and instead is related

[58] 20 U.S.C. § 1228a(b).
[59] *Id.* § 1228a(a).

to policies and political factors. Indeed, the effect of the Non-Continuation Decision is to eliminate mental health support programming based on shifting political objectives.

147. For the foregoing reasons, McKinleyville is entitled to a preliminary and permanent injunction barring Defendants from maintaining their pattern and policy of systematic discontinuations—as reflected in their treatment of the SBMH program grant at issue here. For the same reasons, McKinleyville is entitled, pursuant to 28 U.S.C. § 2201, to a declaration that the Defendants' pattern and policy of systematic discontinuations—as reflected in their treatment of its SBMH program grant—violates the Constitution's guarantee of separation of powers.

**PRAYER FOR RELIEF**

Wherefore, McKinleyville prays that the Court grant the following relief:

148. Declare that Defendants' agency actions culminating in the Non-Continuation Decision are unlawful;

149. Declare that, under 34 C.F.R. § 75.253(b), Defendants may consider only information relevant to a grantee's performance when determining whether the grantee has met the requirements of 34 C.F.R. § 75.253(a); and this determination excludes consideration of new Department priorities not in effect when the grant was originally awarded;

150. Set aside the Non-Continuation Decision as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

151. Enjoin Defendants from taking any steps to discontinue funding for the SBMH programs for the approved budget years based on the reasoning in the Non-Continuation Decision, and require Defendants to make a continuation award based solely on grantee performance;

152. Enjoin Defendants from taking any steps to implement or enforce new grant conditions based on Department priorities not in effect when the grant was originally awarded;

153. Award McKinleyville its reasonable costs, expenses, and attorneys' fees; and

154. Grant such other and further relief as the Court deems fit and proper.

Date: October 22, 2025

PUBLIC COUNSEL

*/s/ Mark Rosenbaum*
Mark Rosenbaum
Tara Ford
Mayra Lira
Amanda Mangaser Savage
Amelia Piazza
Jacob Maddox

Date: October 22, 2025

MORRISON & FOERSTER LLP

*/s/ David J. Wiener*
Dan Marmalefsky
David J. Wiener
Michelle Sosa-Acosta
James K. Murray

Date: October 22, 2025

CALIFORNIA TRIBAL FAMILIES COALITION

*/s/ Kimberly Cluff*
Kimberly Cluff

**ECF ATTESTATION**

I, David J. Wiener, am the ECF User whose ID and password are being used to file this **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**. In accordance with Civil Local Rule 5-4.3.4(a)(2), concurrence in the filing of this document has been obtained from each of the other signatories, and I shall maintain records to support this concurrence for subsequent production for the Court if so ordered or for inspection upon request by a party.

Dated: October 22, 2025

*/s/ David J. Wiener*
David J. Wiener