MARK ROSENBAUM (SBN 59940)
MRosenbaum@publiccounsel.org
TARA FORD (SBN 322049)
TFord@publiccounsel.org
MAYRA LIRA (SBN 273958)
MLira@publiccounsel.org
AMANDA MANGASER SAVAGE (SBN 325996)
ASavage@publiccounsel.org
AMELIA PIAZZA (SBN 342473)
APiazza@publiccounsel.org
JACOB MADDOX (SBN 354368)
JMaddox@publiccounsel.org
VANESSA RAE YOUNG (SBN 352693)
VYoungviniegra@publiccounsel.org
PUBLIC COUNSEL
610 S. Ardmore Avenue
Los Angeles, California 90005
Telephone: 213.385.2977
Facsimile: 213.385.9089

KIMBERLY CLUFF (SBN 196139)
kimberly.cluff@caltribalfamilies.org
CALIFORNIA TRIBAL FAMILIES COALITION
226 W Ojai Ave, Suite 418
Ojai, CA 93023
Telephone: 916.583.8289

DAN MARMALEFSKY (SBN 95477)
DMarmalefsky@mofo.com
DAVID J. WIENER (SBN 291659)
DWiener@mofo.com
MICHELLE SOSA-ACOSTA
(SBN 330776)
MSosaAcosta@mofo.com
JAMES K. MURRAY (SBN 352095)
JMurray@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco CA 94105
Telephone: 415.268.7000
Facsimile: 415.268.7522

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MCKINLEYVILLE UNION SCHOOL DISTRICT,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION; LINDA MCMAHON, in her official capacity as U.S. Secretary of Education,<br><br>Defendants. | Case No. 4:25-CV-09105-YGR<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:   December 30, 2025<br>Time:   2:00 p.m.<br>Ctrm:   1, Fourth Floor<br>Judge:  Hon. Yvonne Gonzalez Rogers |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on December 30, 2025, at 2:00 p.m., or as soon as the matter may be heard, in the courtroom of the Honorable Yvonne Gonzalez Rogers at the United States District Court for the Northern District of California, Ronald V. Dellums Federal Building and United States Courthouse, Courtroom 1 (4th Floor), 1301 Clay Street, Oakland, California 94612, Plaintiff McKinleyville Union School District ("McKinleyville" or the "District") will, and hereby does, move the Court for a preliminary injunction against Defendants U.S. Department of Education and Lina McMahon (together, "Defendants"), pursuant to Federal Rule of Civil Procedure 65 and Civil Local Rules 7-2 and 65-2.

As detailed in the Proposed Order submitted with this Motion, McKinleyville seeks an order enjoining Defendants, as well as their respective officers, agents, servants, employees and attorneys, and any person in active concert or participation with Defendants, from (1) implementing or enforcing through any means the Non-Continuation Decision against McKinleyville, including recompeting SBMH Grant Program funds; and (2) denying McKinleyville a continuation award based on the same or similar reasons, or based on any performance issues caused by the Non-Continuation Decision and its disruptive effects.

This Motion is made on the grounds that:

1.    McKinleyville is likely to prevail on the merits of its claims that: (i) the Non-Continuation Decision violates the Administrative Procedure Act because it is arbitrary and capricious, contrary to law, exceeds Defendants' statutory authority, and contrary to the Constitution; and (ii) the Non-Continuation Decision is unconstitutional because it violates the Spending Clause, the Take Care Clause, and the Due Process Clause.

2.    McKinleyville will be irreparably harmed if Defendants are not enjoined from their actions because McKinleyville and its partner districts need the SBMH Grant Program funds to offer crucial mental health services for children's academic achievement, psychological wellbeing, and physical safety.  Without the Court's intervention, the Non-Continuation Decision will require McKinleyville to lay off staff and cut programs, which will disrupt critical services that ensure student learning and safety.  Additionally, if Defendants are permitted to recompete

these limited funds and obligate them to other grantees, McKinleyville will be deprived of the opportunity for relief, constituting further irreparable harm.

3. The balance of the equities and the public interest favor an injunction because the threat of harm to McKinleyville's mental health care infrastructure far outweighs the federal government's purported interest in ending programmatic mental health care funding in schools.

This Motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the declarations of Luke Biesecker, Julie Giannini-Previde, Shashank Joshi, Tiffany Maher, Rene McBride, Jim McQuillen, Virgil Moorehead, Angela Sundberg, Kelly Vaillancourt Strobach, and Mark D. Weist and Susan B. Barrett, all matters of which the Court may take judicial notice, all other pleadings on file in this action, and any other written or oral argument or evidence that McKinleyville may present to the Court.

Date: November 20, 2025                     PUBLIC COUNSEL

                                            */s/ Mark Rosenbaum*
                                            Mark Rosenbaum
                                            Tara Ford
                                            Mayra Lira
                                            Amanda Mangaser Savage
                                            Amelia Piazza
                                            Jacob Maddox
                                            Vanessa Rae Young

Date: November 20, 2025                     MORRISON & FOERSTER LLP

                                            */s/ Dan Marmalefsky*
                                            Dan Marmalefsky
                                            David J. Wiener
                                            Michelle Sosa-Acosta
                                            James K. Murray

Date: November 20, 2025                     CALIFORNIA TRIBAL FAMILIES
                                            COALITION

                                            */s/ Kimberly Cluff*
                                            Kimberly Cluff

1

**ISSUES TO BE DECIDED**

2      Pursuant to Local Civil Rule 7-4(a)(3), McKinleyville identifies the following issues to be

3   decided:

4      1.      Whether McKinleyville is likely to prevail on the merits of its claims that: (i) the

5   Non-Continuation Decision violates the Administrative Procedure Act because it is arbitrary and

6   capricious, contrary to law, exceeds Defendants' statutory authority, and contrary to the

7   Constitution; and (ii) the Non-Continuation Decision is unconstitutional because it violates the

8   Spending Clause, the Take Care Clause, and the Due Process Clause;

9      2.      Whether McKinleyville will be irreparably harmed absent a preliminary

10   injunction;

11      3.      Whether Defendants will be unduly prejudiced by McKinleyville's requested

12   preliminary injunction;

13      4.      Whether the balance of balance of the equities and the public interest favor an

14   injunction; and

15      5.      Whether the Court should preliminarily enjoin Defendants from (1) implementing

16   or enforcing through any means the Non-Continuation Decision, including recompeting SBMH

17   Grant Program funds; and (2) from reinstituting the Non-Continuation Decision based on the

18   same or similar reasons, including denying a continuation award based on performance issues, if

19   any, caused by the Department's Non-Continuation Decision and its disruptive effects.

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 2

I.    CONGRESS ACTS TO ADDRESS THE STUDENT MENTAL HEALTH CRISIS,
      AND DOE AWARDS HUNDREDS OF SBMH GRANTS ...................................... 2

      A.    The Need for School-Based Mental Health Services.................................... 2

      B.    Congress Establishes, and DOE Implements, the SBMH Grant Program to
            Expand Schools' Capacity to Provide Mental Health Services ..................... 4

      C.    Congress and DOE Prioritize Equitable Access to and Participation in SBMH
            Grant-Funded Projects ................................................................................. 4

      D.    McKinleyville Applies for SBMH Funding Under DOE's Published Priorities ..... 5

      E.    DOE Awards McKinleyville an SBMH Grant and the NH Consortium
            Districts Begin Implementation .................................................................... 6

II.   DOE'S UNLAWFUL NON-CONTINUATION DECISION ............................................ 7

      A.    After Initially Granting an Award, DOE Must Base Its Award Continuation
            Decision on a Grantee's Performance ........................................................... 7

      B.    DOE Sends Boilerplate Notices of Non-Continuation .................................. 7

III.  THE DEVASTATING EFFECTS OF THE NON-CONTINUATION DECISION ........... 9

LEGAL STANDARD ..................................................................................................... 10

ARGUMENT ................................................................................................................. 10

I.    MCKINLEYVILLE IS LIKELY TO SUCCEED ON THE MERITS OF ITS
      CLAIMS CHALLENGING THE NON-CONTINUATION DECISION ......................... 10

      A.    The Non-Continuation Decision Violates the APA ...................................... 10

            1.    The Non-Continuation Decision Constitutes Final Agency Action........... 11

            2.    The Non-Continuation Decision Is Arbitrary and Capricious .................. 12

            3.    The Non-Continuation Decision Is Contrary to Law and Exceeds
                  DOE's Statutory Authority ............................................................... 15

            4.    The Non-Continuation Decision Is Contrary to the Constitution .............. 17

      B.    McKinleyville Is Likely to Succeed on the Merits of Its Constitutional Claims ... 18

            1.    The Non-Continuation Letter Violates Constitutional Separation
                  of Powers ....................................................................................... 18

                  a.    The Non-Continuation Decision Violates the Spending Clause .... 18

                  b.    The Non-Continuation Decision Violates the Take Care Clause... 20

            2.    The Non-Continuation Decision Violates the Due Process Clause .......... 21

II.   MCKINLEYVILLE WILL SUFFER IRREPARABLE HARM IN THE ABSENCE
      OF PRELIMINARY RELIEF ................................................................................... 21

III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY
      FAVOR PRELIMINARY RELIEF ............................................................................ 24

CONCLUSION .............................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*All. for the Wild Rockies v. Cottrell,*

5
  632 F.3d 1127 (9th Cir. 2011) ............................................................................. 10

6

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon,*
  770 F. Supp. 3d 822 (D. Md. 2025) ...................................................................... 11

7

8

*Am. Fed'n of State Cnty. & Mun. Emps. v. U.S. Off. of Mgmt. and Budget,*
  No. 25-cv-08302-SI, 2025 WL 3018250 (N.D. Cal. Oct. 28, 2025) ..................... 14

9

*Arizona Dream Act Coal. v. Brewer,*

10
  757 F.3d 1053 (9th Cir. 2014) ............................................................................. 22

11

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
  548 U.S. 291 (2006) ............................................................................................. 18

12

13

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................................. 11

14

*Brown & Williamson Tobacco Corp. v. FDA,*

15
  153 F.3d 155 (4th Cir. 1998), *aff'd,* 529 U.S. 120 (2000) ................................... 16

16

*Certain Named & Unnamed Non-Citizen Children & Their Parents v. Texas,*
  448 U.S. 1327 (1980) ........................................................................................... 24

17

18

*City & Cnty. of San Francisco v. Trump,*
  897 F.3d 1225 (9th Cir. 2018) ............................................................................. 22

19

*City of Los Angeles v. Barr,*

20
  929 F.3d 1163 (9th Cir. 2019) ............................................................................. 18

21

*Clinton v. City of New York,*
  524 U.S. 417 (1998) ............................................................................................. 20

22

*Dep't of Commerce v. New York,*

23
  588 U.S. 752 (2019) ....................................................................................... 12, 15

24

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) ..................................................................................... 13, 14, 15

25

26

*Dickson v. Sec'y of Def.,*
  68 F.3d 1396 (D.C. Cir. 1995) ............................................................................. 13

27

*Doe v. Noem,*

28
  778 F. Supp. 3d 1151 (W.D. Wash. 2025) ........................................................... 16

*East Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021)......................................................................................... 22

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)...................................................................................................... 15

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012)...................................................................................................... 21

*Flores v. Bennett*,
   No. 22-16762, 2023 WL 4946605 (9th Cir. Aug. 3, 2023)..................................... 21

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
   604 U.S. 542 (2025)................................................................................................ 12, 15

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972)...................................................................................................... 21

*Health Ins. Ass'n of Am., Inc. v. Shalala*,
   23 F.3d 412 (D.C. Cir. 1994)....................................................................................... 16

*Jaffee v. Redmond*,
   518 U.S. 1 (1996).......................................................................................................... 24

*Keene v. City & Cnty. of San Francisco*,
   No. 24-1574, 2025 WL 341831 (9th Cir. Jan. 30, 2025)........................................ 24

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)...................................................................................................... 10

*Michigan v. DeVos*,
   481 F. Supp. 3d 984 (N.D. Cal. 2020)....................................................................... 24

*Michigan v. EPA*,
   576 U.S. 743 (2015)...................................................................................................... 15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)................................................................................................... 12, 15

*N.D. ex rel. parents acting as guardians ad litem v. Haw. Dep't of Educ.*,
   600 F.3d 1104 (9th Cir. 2010)..................................................................................... 24

*N. D. v. Reykdal*,
   102 F.4th 982 (9th Cir. 2024)...................................................................................... 24

*Nat'l Ass'n of Home Builders v. Norton*,
   340 F.3d 835 (9th Cir. 2003)....................................................................................... 16

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, OSHA*,
   595 U.S. 109 (2022)...................................................................................................... 16

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ................................................................................................ 18

*New York v. U.S. Dep't of Educ.*,
    No. 25-1424 (2d Cir. June 20, 2025), ECF No. 40.1 ........................................ 13

*Off. of Pers. Mgmt. v. Richmond*,
    496 U.S. 414 (1990) (White, J. and Blackmun, J., concurring) ........................... 20

*Ohio v. EPA*,
    603 U.S. 279 (2024) ................................................................................................ 12

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) .................................................................................................... 18

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health and*
    *Hum. Servs.*,
    328 F. Supp. 3d 1133 (E.D. Wash. 2018) ............................................................ 25

*Roman v. Wolf*,
    977 F.3d 935 (9th Cir. 2020) ................................................................................. 10

*S. Dakota v. Dole*,
    483 U.S. 203 (1987) ................................................................................................ 20

*Southern Educ. Found. v. U.S. Dep't of Educ.*,
    784 F. Supp. 3d 50 (D.D.C. 2025) ....................................................................... 11

*San Francisco Unified Sch. Dist. v. AmeriCorps*,
    789 F. Supp. 3d 716 (N.D. Cal. 2025) ................................................................. 24

*State of California v. Bureau of Land Mgmt.*,
    286 F. Supp. 3d 1054 (N.D. Cal. 2018) ............................................................... 24

*State of Washington v. U.S. Dep't of Com.*,
    No. C25-1507 MJP, 2025 WL 2978822 (W.D. Wash. Oct. 22, 2025) ............ 15, 18

*Thakur v. Trump*,
    787 F. Supp. 3d 955 (N.D. Cal. 2025), *appeal docketed*, No. 25-4249 (9th Cir.
    July 10, 2025), *stay pending appeal denied*, 148 F.4th 1096 (9th Cir. 2025) ............ 13, 14, 22

*Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed.*
    *R.R. Admin.*,
    988 F.3d 1170 (9th Cir. 2021) ............................................................................... 12

*In re United Mine Workers of Am. Int'l Union*,
    190 F.3d 545 (D.C. Cir. 1999) .............................................................................. 20

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ................................................................................................ 20

*Washington, et al. v. U.S. Dep't of Educ.*,
    No. C25-1228-KKE, 2025 WL 3004675 (W.D. Wash. Oct. 27, 2025) ........................... *passim*

*Washington v. U.S. Dep't of Educ.*,
    No. 25-07157, Dkt. 7.1 (9th Cir. Nov. 14, 2025) ..................................................................... 2

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................................... 10, 21

*Wolford v. Lopez*,
    116 F.4th 959 (9th Cir. 2024) ................................................................................................. 24

**Constitution**

U.S. Const.
    amend. V (Due Process Clause) ............................................................................................. 21
    art. I, § 8, cl. 1 (Spending Clause) ........................................................................................ 18
    art. II, § 3 (Take Care Clause) .............................................................................................. 20

**Statutes**

5 U.S.C.
    § 551 (Administrative Procedure Act) ................................................................................... 10
    § 706 ..................................................................................................................... 10, 12, 15, 17

General Education Provisions Act Section 427, 20 U.S.C.

    § 1228a(a) ............................................................................................................................... 21
    § 1228a(b) ............................................................................................. 4, 14, 17, 20, 21

Bipartisan Safer Communities Act of 2022,
    Pub. L. No. 117-159, 136 Stat. 1313, 1341 (2022) .................................................................. 4

**Regulations**

34 C.F.R.
    § 75.100 ................................................................................................................................... 16
    § 75.101 ................................................................................................................................... 16
    § 75.105 ....................................................................................................................... 4, 16, 19
    § 75.118 ............................................................................................................................... 7, 16
    § 75.217 ..................................................................................................................................... 4
    § 75.251 ................................................................................................................................... 14
    § 75.253 ..................................................................................................... 7, 12, 14, 16, 17, 19

45 Fed. Reg. 22,552 (Apr. 3, 1980) .......................................................................................... 17

59 Fed. Reg. 30,258 (June 10, 1994) ..................................................................................... 7, 16

87 Fed. Reg. 47,159 (Aug. 2, 2022) ......................................................................................... 19

87 Fed. Reg. 60,092 (Oct. 4, 2022) .................................................................... 19

89 Fed. Reg. 15,173 (Mar. 1, 2024) ............................................................... 5, 14

89 Fed. Reg. 1982 (Jan. 11, 2024) ...................................................................... 6

90 Fed. Reg. 46,573 (Sept. 29, 2025) .................................................................. 8

**Other Authorities**

Breccan F. Thies, *Education Department Cuts $1B In 'Mental Health' Grants
    Used To Advance DEI*, The Federalist (Apr. 30, 2025),
    https://thefederalist.com/2025/04/30/education-department-cuts-1b-in-mental-
    health-grants-used-to-advance-dei/ .............................................................. 8

*Healthy Beginnings / Reducing Adverse Childhood Experiences*, Let's Get Healthy
    California, https://letsgethealthy.ca.gov/goals/healthy-beginnings/adverse-
    childhood-experiences ................................................................................. 3

*School Based Mental Health Services (SBMH) Grant Program: FY2024 Grant
    Competition Stakeholder Resource*, DOE at 3,
    https://www.ed.gov/sites/ed/files/2024/03/SBMH-Brochure_FY24.pdf. ............... 5

U.S. Dep't of Educ., *Discretionary Grantmaking at ED* (2024) ..................... 7, 14, 16

WestEd, *California Healthy Kids Survey: Humboldt County, Secondary 2021-
    2023 Main Report*, Cal. Dep't of Educ. (Apr. 20, 2024),
    https://data.calschls.org/resources/Humboldt_County_2123_Sec_CHKS.pdf. .......... 3

PLAINTIFF'S MOT. FOR PRELIMINARY
INJUNCTION
    ix
    CASE NO.: 4:25-CV-09105-YGR

**INTRODUCTION**

Plaintiff McKinleyville Union School District ("McKinleyville" or "the District") seeks preliminary injunctive relief from the Department of Education's ("DOE" or "the Department") unlawful agency actions that threaten critical mental health services for students.

In 2024, DOE awarded McKinleyville a five-year grant through DOE's School-Based Mental Health Services Grant Program ("SBMH Grant Program"). The grant was set to fund vital, lifesaving, and otherwise unavailable mental health support to hundreds of students in rural schools in Humboldt County, California, through December 31, 2029. On April 29, 2025, in violation of DOE's regulations governing continuation awards and the constitutional separation of powers, DOE sent boilerplate letters, without any individualized assessment of grantee performance, to grantees across the country, including McKinleyville, notifying them that their grants would not be continued after December 31, 2025 (hereinafter, the "Non-Continuation Decision").

The Non-Continuation Decision will have devastating effects on McKinleyville. As set forth below and in the declarations of Julie Giannini-Previde and Tiffany Maher, McKinleyville will be forced to lay off mental health professionals and staff, walk back plans to fund tuitions and stipends for their staff's mental health credentialing, and abandon plans to develop in-house trainers to teach their staff safe crisis intervention strategies. The result will be to deprive McKinleyville students of critical and lifesaving mental health care.

On October 27, 2025, in an action brought by the attorneys general of sixteen states, the U.S. District Court for the Western District of Washington found that DOE's Non-Continuation Decision likely violated the Administrative Procedure Act and issued a preliminary injunction barring DOE from "implementing or enforcing through any means the discontinuation decisions . . . including recompeting Program funds[.]" *Washington, et al. v. U.S. Dep't of Educ.*, 2025 WL 3004675, at *13 (W.D. Wash. Oct. 27, 2025). The court found that DOE's boilerplate discontinuation letters were "arbitrary and capricious" because they were "unexplained and conclusory," and because DOE failed to consider grantees' reliance interests and acted without

1    individualized rationales. *Id.* at *7–9.[1]

2          For those same reasons, and to prevent DOE's ongoing violations of core principles of

3    constitutional separation of powers, McKinleyville requests that this Court set aside the Non-

4    Continuation Decision and order DOE to follow Congressional directives and its own regulations

5    when determining whether to continue McKinleyville's SBMH grant award.

6                              **FACTUAL BACKGROUND**

7    **I.    CONGRESS ACTS TO ADDRESS THE STUDENT MENTAL HEALTH CRISIS,**
8    **AND DOE AWARDS HUNDREDS OF SBMH GRANTS**

9          **A.    The Need for School-Based Mental Health Services**

10         Students across the country are experiencing a mental health epidemic. *See* Weist & Barrett

11   Decl. ¶ 8.  The effects on students and schools are profound.  Unaddressed student mental health

12   needs lead to short- and long-term health problems, lower academic performance, increased school

13   suspensions and expulsions, and a heightened risk of students dying by suicide and drug overdose.

14   *See* Joshi Decl. ¶¶ 22, 24.

15         Students in Humboldt County are particularly susceptible to the effects of unaddressed

16   trauma given the County's rural setting. *See* Moorehead Decl. ¶¶ 7, 22 (describing the barriers and

17   shortages of mental health services in rural areas, which compound the County's high rates of

18   behavioral health challenges).  Humboldt County has California's highest rate of adverse childhood

19   experiences—traumatic incidents that occur during childhood, such as experiencing violence,

20   abuse, or neglect, or having a family member attempt or die by suicide.[2]  *See id.* ¶ 22.  Fifty-eight

21   ─────────────────────────

22   [1] The *Washington* injunction expressly applies to the Non-Continuation Decision relating to the
     SBMH grant awarded to McKinleyville that is at issue in this case. *Id.* at *13–14.  Defendants
     have appealed the district court's preliminary injunction and, on November 14, 2025, moved for a
23   stay pending appeal, arguing that the *Washington* plaintiffs lack standing to obtain relief on behalf
     of McKinleyville. Defendants have also stated their intention to "make new grant awards"—that
24   is, potentially recompete the existing SBMH funds—"by the end of the year." *See Washington v.
     U.S. Dep't of Educ.*, No. 25-07157, Emergency Motion Under Circuit Rule 27-3 For Stay
25   Pending Appeal, Dkt. 7.1 at ECF 2, 20–22 (9th Cir. Nov. 14, 2025).  On November 19, the Ninth
     Circuit calendared oral argument for December 2.  McKinleyville has filed this separate action
26   and motion out of an abundance of caution and to protect its rights in the event of the dissolution
     of the *Washington* injunction.
27
     [2] Other such traumatic experiences that impact long term mental health include food insecurity,
28   homelessness or unstable housing, or discrimination.

1  percent of Humboldt County children suffer multiple adverse childhood experiences vs. 36%

2  statewide, and 28% of adults in Humboldt County report experiencing four or more ACEs vs. 15%

3  statewide.[3]  By high school, more than one in five Humboldt County students report they have

4  considered suicide.[4]  The rate of death by suicide in Humboldt County is also consistently higher

5  than the statewide rate.  Joshi Decl. ¶ 40.

6      The remote, rural nature of Humboldt County significantly limits access to mental health

7  care, especially for children.  *See* Joshi Decl. ¶ 48; Sundberg Decl. ¶ 7.  There is a critical shortage

8  of pediatric psychologists and psychiatrists in the region.  *See* Giannini-Previde Decl. ¶ 52;

9  McBride Decl. ¶ 11.  Waitlists for counseling and other mental health treatments can be months

10  long.  *See* Giannini-Previde Decl. ¶ 52; McQuillen Decl. ¶ 17.  Humboldt County schools struggle

11  to hire and retain mental health professionals, as it is difficult to recruit and retain these

12  professionals in the isolated region.  *See* Joshi Decl. ¶¶ 48–49.

13      Humboldt County tribes face similar obstacles in accessing mental health care.  Tribal

14  youth, in particular, require mental health care to address intergenerational trauma, which

15  commonly leads to depression, self-harming behavior, suicidal ideation, and disengagement with

16  school life.  *See* Moorehead Decl. ¶¶ 8–9; McQuillen Decl. ¶ 14; Sundberg Decl. ¶¶ 10–12.  Tribal

17  families often receive mental health care and related resources through schools.  *See* McQuillen

18  Decl. ¶¶ 11–13.  A decrease in federal funding for mental health services will lead to increased

19  absenteeism, behavioral problems, self-destructive acts, and ongoing personal anguish for tribal

20  students.  *See id.* ¶ 19.

21      For McKinleyville students, these hardships are compounded by their socioeconomic status

22  and constrained school services.  McKinleyville serves approximately 850 students through eighth

23  grade on three campuses, 60% of whom are socioeconomically disadvantaged.  *See* Giannini-

24  Previde Decl. ¶¶ 8, 10.  After the COVID-19 pandemic, McKinleyville did not have *any* school

25

26  [3] *Healthy Beginnings / Reducing Adverse Childhood Experiences*, Let's Get Healthy California, https://letsgethealthy.ca.gov/goals/healthy-beginnings/adverse-childhood-experiences (last visited Oct. 20, 2025).

27

28  [4] WestEd, *California Healthy Kids Survey: Humboldt County, Secondary 2021-2023 Main Report*, Cal. Dep't of Educ. (Apr. 20, 2024), https://data.calschls.org/resources/Humboldt_County_2123_Sec_CHKS.pdf.

1   social workers, and had only one school counselor.  *Id.* ¶ 27.

2   **B.    Congress Establishes, and DOE Implements, the SBMH Grant Program to Expand Schools' Capacity to Provide Mental Health Services**

3

4   On February 14, 2018, seventeen students and staff were killed in a mass shooting at

5   Marjory Stoneman Douglas High School in Parkland, Florida.   In the wake of this tragedy,

6   Congress established the SBMH Grant Program to address the unmet need for adequate mental

7   health services in K–12 schools.   In 2022, after a mass shooting at Robb Elementary School in

8   Uvalde, Texas, Congress allocated $1 billion to the SBMH Program and related programs to be

9   distributed in fiscal years 2022 through 2026.  Bipartisan Safer Communities Act of 2022, Pub. L.

10  No. 117-159, 136 Stat. 1313, 1341 (2022).

11  Since the creation of the SBMH Grant Program, DOE has held grant competitions and

12  awarded hundreds of multi-year grants across the country.   Applications are selected based on

13  applicable statutes and regulations, including priorities, selection criteria, and other requirements

14  published in the Federal Register after formal DOE rulemaking.  *See* 34 CFR § 75.217.   DOE

15  identifies both "absolute priorities" and "competitive preference priorities" for applications.  *See*

16  34 C.F.R. § 75.105.

17  **C.    Congress and DOE Prioritize Equitable Access to and Participation in SBMH Grant-Funded Projects**

18

19  Congress and DOE prioritized equitable access to and participation in projects funded by

20  the SBMH Grant Program.   Section 427 of the General Education Provisions Act ("GEPA")

21  requires applicants to "develop and describe . . . the steps such applicant proposes to take to ensure

22  ***equitable access to, and equitable participation in***, the project or activity to be conducted . . . ***to***

23  ***overcome barriers to equitable participation, including barriers based on gender, race, color,***

24  ***national origin, disability, and age***."  20 U.S.C. § 1228a(b) (emphases added).

25  DOE   priorities   established   through   statutorily-required   rulemaking   reflect   this

26  congressional mandate.  When McKinleyville applied for its grant, DOE's second competitive

27  priority gave preference to applicants that proposed a plan to increase the number of credentialed

28  school-based  mental  health  services  providers  from  diverse  backgrounds  or  communities.

Applications for New Awards; School-Based Mental Health Services Grant Program, 89 Fed. Reg. 15,173, 15,175 (Mar. 1, 2024); *see* Giannini-Previde Decl., Ex. A at P.0032.  Other DOE grant materials reiterated these goals, making clear that the grant "aim[s] to address student mental health needs by providing . . . [m]ore providers from diverse backgrounds."[5]  DOE's grant application required applicants, including McKinleyville, to ensure equitable access in compliance with GEPA's Equity Directive.  Giannini-Previde Decl., Ex. A at P.008.

**D.    McKinleyville Applies for SBMH Funding Under DOE's Published Priorities**

On May 31, 2024, McKinleyville applied for SBMH funding on behalf of the Northern Humboldt School Based Mental Health Consortium ("NH Consortium"), comprised of McKinleyville and two nearby districts.  *See* Giannini-Previde Decl., Ex. A at P.008.

McKinleyville reasonably relied on DOE's published priorities and guidance when it applied for the SBMH grant.  In accordance with grant priorities, McKinleyville proposed a project to expand the NH Consortium's capacity to train, hire, and retain mental health personnel over five years.  This expansion would reduce student-to-provider ratios and enable earlier and more effective mental and behavioral health interventions.  McKinleyville's grant application also complied with GEPA's Equity Directive: "[through] a combination of outreach, community engagement, resource allocation, and professional development initiatives, [the] NH [Consortium] is dedicated to addressing the unique needs of rural communities and ensuring that all students have the opportunity to thrive."  Giannini-Previde Decl., Ex. A at P.008.

McKinleyville's grant would fund increased staffing to support mental health needs: six full-time, credentialed mental health service providers to deliver a broad range of direct services to students and host placements for graduate student social work interns; three full-time Multi-Tiered System of Supports ("MTSS") Instructional Coaches to train, coach, and guide the implementation of MTSS strategies across each local educational agency; and one full-time Project Director to provide overall leadership and strategic oversight.  Giannini-Previde Decl., Ex. A at P.0049–52.

To develop mental health staff that reflects and is invested in Humboldt County,

---

[5] *School Based Mental Health Services (SBMH) Grant Program: FY2024 Grant Competition Stakeholder Resource*, DOE at 3, https://www.ed.gov/sites/ed/files/2024/03/SBMH-Brochure_FY24.pdf (last visited Nov. 12, 2025) at 3.

McKinleyville also proposed using grant funding to provide stipends for certain employees to pursue mental health credentialing.  In addition, the grant would fund professional support, competitive salaries, and ongoing training opportunities.  *See* Giannini-Previde Decl., Ex. A at P.0045.

### E.    DOE Awards McKinleyville an SBMH Grant and the NH Consortium Districts Begin Implementation

On October 17, 2024, DOE sent McKinleyville a Grant Award Notification for the five-year period from January 1, 2025, through December 31, 2029.  *See* Giannini-Previde Decl., Ex. B at P.004:

| BUDGET PERIOD | DATE | AMOUNT |
|---|---|---|
| 1 | 01/01/2025-12/31/2025 | $1,289,075.00 |
| 2 | 01/01/2026-12/31/2026 | $1,389,270.00 |
| 3 | 01/01/2027-12/31/2027 | $1,445,929.00 |
| 4 | 01/01/2028-12/31/2028 | $1,494,080.00 |
| 5 | 01/01/2029-12/31/2029 | $1,533,873.00 |

The Grant Award Notification assured McKinleyville that the "Secretary anticipates future funding for this award according to the schedule[.]"  Giannini-Previde Decl., Ex. B at P.005.  This assurance was consistent with DOE's public representations that it would generally exercise its discretion to continue funding multi-year grant awards.  DOE previously assured grant recipients that it does not generally "deny a large number of non-competing continuation awards and, if that does happen, grantees are often aware of the likelihood of the decision well in advance and often cite no concerns if they do not receive a continuation award."  Education Department General Administrative Regulations and Related Regulatory Provisions, 89 Fed. Reg. 1982, 2002 (Jan. 11, 2024).

After receiving the grant, McKinleyville structured its budget with the understanding that it would have several years to generate performance results and build relationships with new funding sources.  McKinleyville hired a new school social worker and school psychologist, and the District was also able to re-hire an additional school psychologist whose position had been eliminated due to lack of funding.  Giannini-Previde Decl. ¶ 37; Maher Decl. ¶ 17.  McKinleyville also began identifying its paraprofessional staff who would receive grant funding to pursue mental health

1    credentialing.  Maher Decl. ¶ 18.

2    **II.      DOE'S UNLAWFUL NON-CONTINUATION DECISION**

3           **A.      After Initially Granting an Award, DOE Must Base Its Award Continuation
               Decision on a Grantee's Performance**

4

5           Unlike applicants applying for new grant awards, existing grantees do not compete for

6    continued funding.  Rather, after the first year of a multi-year SBMH grant award, grantees are

7    required under 34 C.F.R. § 75.118 to submit annual performance reports to continue receiving

8    funding.

9           DOE regulations require the Department to consider only a grantee's performance,

10   including performance measures, performance reports, and financial data, when deciding whether

11   a grantee has met the requirements for a continuation award.  *See* 34 C.F.R. § 75.253(b) (2024)

12   (identifying "any relevant information regarding grantee performance" as the sole "[i]nformation

13   considered" when "determining whether the grantee has met the requirements described in

14   paragraph (a)"); Direct Grant Programs, 59 Fed. Reg. 30,258, 30,259 (June 10, 1994) ("[T]he

15   continuation award decision . . . will be based entirely on the submission of [performance] reports

16   . . . rather than on the submission of a continuation award application."); *see also* U.S. Dep't of

17   Educ., *Discretionary Grantmaking at ED* ("*Discretionary Grantmaking*"), at 31–32 (2024)

18   (describing the performance information used by DOE for its continuation award decision).

19          **B.      DOE Sends Boilerplate Notices of Non-Continuation**

20          On April 29, 2025, DOE notified SBMH grantees across the country, including

21   McKinleyville, that their grants would not be continued after December 31, 2025.  *See* Giannini-

22   Previde Decl., Ex. C.

23          DOE communicated the Non-Continuation Decision through a two-page boilerplate letter,

24   stating that the grant "reflect[s] the prior Administration's priorities and policy preferences and

25   conflict[s] with those of the current Administration" and that it "no longer effectuates[] the best

26   interest of the Federal Government and will not be continued."  *See* Giannini-Previde Decl., Ex. C

27   at P.002.  The letter offers no reasoning for DOE's decision to discontinue McKinleyville's grant.

28   It provides neither information about the purported change in the government's "best interest" nor

1  any individualized analysis of how McKinleyville's SBMH programs are inconsistent with that

2  interest.  The Non-Continuation Decision also says nothing about McKinleyville's performance

3  under the grant.  Nor could it: McKinleyville has not yet submitted any performance report or data

4  to DOE, as its first annual performance report is due in February 2026.

5       Following issuance of the Non-Continuation Decision, DOE publicly stated it would cut

6  funding, at least in part, because it rejected the SBMH Grant Program's established grant priorities

7  and the GEPA Equity Directive:

8      The Department [of Education] decided not to continue funding these grants beyond
the initial award terms. These grants are intended to improve American students'

9      mental health by funding additional mental health professionals in schools and on
campuses.  .  .  .  Instead, under the deeply flawed priorities of the Biden

10      Administration, grant recipients used the funding to implement *race-based actions*
like recruiting quotas in ways that have nothing to do with mental health and could

11      hurt the very students the grants are supposed to help.[6]

12       DOE's decision to discontinue funding for the SBMH program caused widespread public

13  and congressional backlash.  During a Senate Appropriations hearing, senators pressed Defendant

14  McMahon on the rationale for discontinuing these vital programs.  *See* Wiener Decl., Ex. A at 68.

15  When asked about "the impact [of discontinuation] on those kids," Defendant McMahon cited

16  "programs in the mental health program that did deal with DEI and . . . with gender issues." *Id.*

17       On September 29, 2025, DOE invited new applications for SBMH Grant Program funding.

18  *See* Applications for New Awards; School-Based Mental Health Services Grant Program, 90 Fed.

19  Reg. 46,573 (Sept. 29, 2025).  McKinleyville will not be able to obtain new SBMH funding, as the

20  District does not meet DOE's new definition of a "high-need LEA."  *See* Applications for New

21  Awards; School-Based Mental Health Services Grant Program, 90 Fed. Reg. 46,573, 46,576 (Sept.

22  29, 2025).  Even if McKinleyville is eligible, the SBMH Grant Program no longer supports hiring

23  counselors or social workers as McKinleyville previously planned.  Moreover, DOE's estimated

24  maximum award for the new grants is less than half of the funding McKinleyville was awarded for

25  the next four years.

26

27  [6] Breccan F. Thies, *Education Department Cuts $1B In 'Mental Health' Grants Used To Advance
DEI*, The Federalist (Apr. 30, 2025), https://thefederalist.com/2025/04/30/education-department-

28  cuts-1b-in-mental-health-grants-used-to-advance-dei/ (emphasis added) (internal quotation marks
omitted).

1    **III.    THE DEVASTATING EFFECTS OF THE NON-CONTINUATION DECISION**

2         Based on the Grant Award Notification and DOE's assurances regarding grant continuation,

3    McKinleyville expected to receive funding through December 31, 2029, and designed its initiatives

4    for a five-year term.  Giannini-Previde Decl. ¶ 36, Ex. B at P.004.  However, after receiving the

5    Non-Continuation Decision, McKinleyville faces significant program cuts and layoffs.  Giannini-

6    Previde Decl. ¶ 48; Maher Decl. ¶ 26.  Because its funding will end in December 2025,

7    McKinleyville must reallocate funds just to keep new staff in their roles through the end of the

8    school year, if it can retain the staff at all.  *See* Giannini-Previde Decl. ¶ 48; Maher Decl. ¶ 26.

9    There is no funding to continue McKinleyville's new positions or programs in subsequent years.

10   Maher Decl. ¶¶ 26–28. McKinleyville will therefore need to scale back its staffing—including

11   providing layoff notices by March 15, 2026—and program development plans, jeopardizing its

12   students' mental health.  Giannini-Previde Decl. ¶¶ 46–48.

13        McKinleyville's Project Coordinator overseeing the grant project will lose her grant-funded

14   employment in 2026, meaning the District may lose an educator and administrator with 25 years of

15   experience in Humboldt Schools.  Maher Decl. ¶ 29.  McKinleyville's MTSS Instructional Coach

16   position will be eliminated, and the staff member will have to return to classroom teaching at the

17   end of the academic year.  Giannini-Previde Decl. ¶ 49.  The District also had to abandon plans to

18   help current staff obtain mental health certifications, and it can no longer pay staff to supervise

19   graduate-level mental health interns in its schools.  *Id.* ¶¶ 50–51.  In addition, McKinleyville must

20   abandon its plan to develop in-house trainers to instruct staff in safe crisis intervention.  *Id.* ¶ 50.

21        Without the SBMH funding, McKinleyville and its partner districts are at risk of being

22   unable to offer the planned mental health services crucial for children's academic achievement,

23   psychological wellbeing, and physical safety.  *See* Giannini-Previde Decl. ¶ 52–53; McBride Decl.

24   ¶ 39; Biesecker Decl. ¶¶ 25–27; Vaillancourt Strobach Decl. ¶ 45.  Teachers will lose invaluable

25   support in managing classroom behaviors and addressing learning challenges.  Giannini-Previde

26   Decl. ¶ 55.  McKinleyville will subsequently lose teachers due to burnout, worsening the quality of

27   education in the District.  *Id.*  And students, including tribal members, will lose connections with

28   mental health staff who are often the only trusted adults in their lives.  *See* Maher Decl. ¶ 26.

**LEGAL STANDARD**

A preliminary injunction should issue when a plaintiff shows that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors merge in cases in which the government is a party. *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020).

Under the Ninth Circuit's sliding-scale approach, "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). A plaintiff may thus obtain an injunction by showing "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff," provided "the other two elements of the *Winter* test are also met." *Id.* at 1132 (internal quotation marks omitted).

**ARGUMENT**

McKinleyville has satisfied the *Winter* factors for issuance of a preliminary injunction.

**I.    MCKINLEYVILLE IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS CHALLENGING THE NON-CONTINUATION DECISION**

McKinleyville is likely to succeed on the merits of both its Administrative Procedure Act ("APA") claims (Counts I-III) and its constitutional claims (Counts IV-VI).

**A.    The Non-Continuation Decision Violates the APA**

Under the APA, this Court may "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(A)–(D). Courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024); *see* 5 U.S.C. § 706 (courts must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning . . . of the terms of an agency action.").

As shown below, McKinleyville is likely to succeed on the merits of its APA claim because the Non-Continuation Decision constitutes a final agency action that is contrary to law, arbitrary

and capricious, and contrary to the Constitution.

### 1.    The Non-Continuation Decision Constitutes Final Agency Action

The Non-Continuation Decision constitutes "final agency action" subject to review under the APA.  Agency actions are "final" where the challenged actions (1) "mark the consummation" of agency decision-making and (2) determine "rights or obligations . . . from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks and citations omitted).  The Non-Continuation Decision satisfies both prongs of this test.[7]

First, the Non-Continuation Decision was the consummation of DOE's decision-making process because it announced a final decision "not to continue [McKinleyville's] federal award . . . in its entirety, effective at the end of your current grant budget period."  Giannini-Previde Decl., Ex. C at P.002.  It required McKinleyville to discharge any "closeout responsibilities," "submit all final reports," and "promptly refund any unobligated funds." *Id.* at P.003.  McKinleyville promptly sought reconsideration of the Non-Continuation Decision, and in response, DOE reiterated its prior unlawful decision, stating that "this determination represents the final decision of the Department." *See* Giannini-Previde Decl., Ex. E at P.003.

Second, the Non-Continuation Decision immediately produced legal consequences for McKinleyville because it can no longer access previously awarded funds for 2026 and succeeding years.  *See generally* Giannini-Previde Decl., Ex. C.  Courts across the country have found that similar decisions constitute final agency action for purposes of the APA.  *See Washington*, 2025 WL 3004675, at *11 (concluding Non-Continuation Decision constituted final agency action); *Southern Educ. Found. v. U.S. Dep't of Educ.*, 784 F. Supp. 3d 50, 73-74 (D.D.C. 2025) (concluding DOE letter terminating education-related grant on the basis of "DEI issues" constituted final agency action); *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 846 (D. Md. 2025) (finding DOE's termination of education-related grants "immediately produced legal consequences").

---

[7] In the related proceedings in *Washington*, DOE did not contest that the Non-Continuation Decisions represent final agency action.  *Washington*, 2025 WL 3004675, at *6, n.5.

**2.     The Non-Continuation Decision Is Arbitrary and Capricious**

The APA prohibits arbitrary and capricious agency action.  5 U.S.C. § 706(2)(A).  Agency action must be "reasonable and reasonably explained."  *Ohio v. EPA*, 603 U.S. 279, 280 (2024).  In deciding whether a final agency action is arbitrary and capricious, the Court evaluates "whether the [agency] examined the relevant data and articulated a satisfactory explanation for [its] decision, including a rational connection between the facts found and the choice made."  *Transp. Div. of the Int'l Ass'n of Sheet Metal, Air, Rail, & Transp. Workers v. Fed. R.R. Admin.*, 988 F.3d 1170, 1182 (9th Cir. 2021) (quoting *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019)).  An agency cannot meet this requirement where it "entirely fail[s] to consider an important aspect of the problem" or "relie[s] on factors which Congress has not intended[.]"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  When an agency departs from a prior policy, it must display awareness that it is changing position, offer good reasons for the new policy, and consider serious reliance interests.  *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 570 (2025).

The Non-Continuation Decision is arbitrary and capricious for at least six reasons.

***First***, DOE did not consider McKinleyville's grant performance during the award period—a direct violation of the grant-making process implemented by DOE's governing regulations.  *See* 34 C.F.R. § 75.253(b).  DOE regulations specify that it may only consider a grantee's performance, including performance measures, performance reports, and financial data, when deciding whether the grantee meets the requirements to receive a continuation award.  *See id.*  DOE did not base its continuation award decision on McKinleyville's performance.  Instead, DOE exclusively focused on, and unlawfully based its decision upon, new policy preferences that conflict with the original DOE priorities on which McKinleyville relied when applying for its grant.

***Second***, DOE failed to provide an adequate explanation for its decision.  *See State Farm*, 463 U.S. at 43 ("The agency must . . . articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (internal quotation marks omitted)).  The Non-Continuation Decision repeated the same boilerplate explanation that was sent to dozens of other grantees throughout the country.  It did not reflect any reasoned consideration of

McKinleyville's programs.   As in *Washington*, DOE's "wholly conclusory" and boilerplate explanation has similarly left McKinleyville guessing why its grant was discontinued.  2025 WL 3004675, at *7.  Agency decisions untethered to specific grants and the performance of specific grantees show a complete lack of individualized assessment and epitomize arbitrary and capricious action.  *See, e.g.*, *Thakur v. Trump*, 787 F. Supp. 3d 955, 982–83 (N.D. Cal. 2025) ("[F]orm termination letters" made it "impossible to determine" what "resulted in the termination of the grant, much less why the specific project was found to be incompatible with the Agency's priorities"), *appeal docketed*, No. 25-4249 (9th Cir. July 10, 2025), *stay pending appeal denied*, 148 F.4th 1096 (9th Cir. 2025); Op. at 4, *New York v. U.S. Dep't of Educ.*, No. 25-1424 (2d Cir. June 20, 2025), ECF No. 40.1 (blanket action failed to provide individualized assessment); *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995) (faulting boilerplate language for making it impossible to discern agency's rationale).

**Third**, the Non-Continuation Decision fails to consider "serious reliance interests," including McKinleyville's reasonable reliance on DOE's promulgated grant priorities, and the harm that discontinuing the grant would inflict on its students and staff.  "When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account."  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citation modified).

McKinleyville structured its programs and budgets understanding that DOE would evaluate and make annual continuation awards based on its project performance.  McKinleyville's reliance was reasonable and supported by, among other things:

- DOE's longstanding history and practice of basing continuation award decisions on grantee performance under this and other grant programs.  *See* Direct Grant Programs, 59 Fed. Reg. 30258, 30,259 (June 10, 1994) (providing that "continuation award decision[s] . . . will be based entirely on the submission of [performance] reports");

- DOE regulations expressly: (1) providing that when DOE "approves a multi-year project period, the Secretary . . . [i]ndicates his or her intention to make continuation awards to fund the remainder of the project period," 34 C.F.R. § 75.251(b)(2); (2)

1    requiring DOE to consider any information relevant to grantee's performance, 34 C.F.R.

2    § 75.253(b); and (3) requiring DOE to assign priority to "continuation awards over new

3    grants," 34 C.F.R. § 75.253(c); and

4    • DOE guidance explaining to prospective grantees that "program staff uses the

5    information in the performance report in combination with the project's fiscal

6    management performance data to determine subsequent funding decisions."

7    *Discretionary Grantmaking*, at 32.

8    As the district court observed in *Washington*, there is "no evidence . . . that Defendants

9    considered *any* reliance interests (as Defendants conceded at oral argument. . . .)." 2025 WL

10   3004675, at *8 (emphasis added). The failure to "assess reliance interests" is arbitrary and

11   capricious. *Am. Fed'n of State Cnty. & Mun. Emps. v. U.S. Off. of Mgmt. and Budget*, 2025 WL

12   3018250, at *19 (N.D. Cal. Oct. 28, 2025); *see Regents of the Univ. of Cal.*, 591 U.S. at 30–

13   33 (Where an agency is "not writing on a blank slate" it is "required to assess whether there were

14   reliance interests, determine whether they were significant, and weigh any such interests against

15   competing policy concerns").

16   **Fourth**, in deciding to discontinue the McKinleyville grant, DOE relied on factors that

17   Congress did not intend for DOE to consider, including considerations that conflict with pre-

18   existing congressional directives for the SBMH Grant Program. Under the GEPA Equity Directive,

19   Congress requires grant applicants to describe in their applications the steps they will take to ensure

20   equity in their programs. 20 U.S.C. § 1228a(b). Indeed, DOE implemented this requirement in its

21   application materials for SBMH Grants—both as a stated priority and as a required form for

22   applicants to explain how they would ensure equity. *See* Applications for New Awards; School-

23   Based Mental Health Services Grant Program, 89 Fed. Reg. 15,173, 15,175 (Mar. 1, 2024)

24   (providing that diversifying providers was a priority); Giannini-Previde Decl., Ex. A at P.008.

25   However, DOE discontinued the grants because grantees, including McKinleyville, tried to build a

26   diverse staff of mental health providers. This is arbitrary and capricious because DOE relied on

27   factors Congress did not intend for DOE to consider—and because the decision contradicts

28   Congress's mandate, it is also contrary to law. *See Thakur*, 787 F. Supp. 3d at 980 (Federal agencies

do "not have the authority to decline to follow a statutory mandate or prohibition simply because of policy objections" (internal quotation marks and citation omitted)).

*Fifth*, the Non-Continuation Decision does not explain DOE's reversal from "the prior Administration's priorities and policy preferences." Giannini-Previde Decl., Ex. C at P.002. The "change-in-position doctrine" prevents agencies from "mislead[ing] regulated entities" by requiring that agencies changing their existing policies display awareness that they are changing their position, offer good reasons for the new policy, and consider serious reliance interests. *Wages & White Lion Invs., LLC*, 604 U.S. at 570. Although an agency need not always provide a more detailed justification than what would suffice for "a new policy created on a blank slate," it must do so where a policy "has engendered serious reliance interests." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, DOE's Non-Continuation Decision only obliquely references DOE's new policy preferences without identifying or explaining this changed position or how it allegedly conflicts with the prior Administration's priorities and policy preferences.

*Finally*, the Non-Continuation Decision fails to consider reasonable alternatives, much less provide a reasoned explanation for rejecting any such alternatives. The Court must assess the "grounds that [DOE] invoked" when it discontinued the grant. *See Michigan v. EPA*, 576 U.S. 743, 758 (2015); *see also State Farm*, 463 U.S. at 50. DOE must "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [the] decision, 'including a rational connection between the facts found and the choices made.'" *Dep't of Com.*, 588 U.S. at 773 (citation omitted). The Non-Continuation Decision does not reflect any assessment of whether affected SBMH grant projects could be adjusted, rather than discontinued, to comply with the new "best interest of the Federal Government" or whether DOE considered anything other than non-continuation to effectuate its new policy preferences. DOE's failure to consider these alternatives renders the Non-Continuation Decision arbitrary and capricious. *See Regents of the Univ. of Cal.*, 591 U.S. at 30.

### 3. The Non-Continuation Decision Is Contrary to Law and Exceeds DOE's Statutory Authority

Under the APA, a court must "set aside" agency action that is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. § 706(2)(A), (C). It

1    is "contrary to law for an agency to disregard its own regulations and policies." *Doe v. Noem*, 778

2    F. Supp. 3d 1151, 1160 (W.D. Wash. 2025) (citing *Nat'l Ass'n of Home Builders v. Norton*, 340

3    F.3d 835, 852 (9th Cir. 2003)).   Moreover, because DOE is a "creature[] of statutes" and

4    "possess[es] only the authority that Congress has provided," it may only exercise authority granted

5    by statute. *See Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, OSHA*, 595 U.S. 109, 117 (2022).   In

6    reviewing agency action, a court cannot accept "the agency's policy judgments . . . . if they conflict

7    with the policy judgments that undergird the statutory scheme." *Health Ins. Ass'n of Am., Inc. v.

8    Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994); *see Brown & Williamson Tobacco Corp. v. FDA*, 153

9    F.3d 155, 176 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000) (explaining that "federal agencies" cannot

10   "substitute their policy judgments for those of Congress").

11        The Non-Continuation Decision is contrary to law because it violates DOE's own

12   regulations addressing continuation funding for multi-year grant awards.  As discussed above, when

13   considering whether a grantee has fulfilled the requirements to receive a continuation award, DOE

14   must look only to "any relevant information regarding grantee performance."   34 C.F.R.

15   § 75.253(b) (2024); *see also Discretionary Grantmaking* at 32 (explaining that a grantee's

16   performance is needed to determine whether § 75.253(a) requirements are met, including the

17   requirement that "continuation of the project is in the best interest of the Federal government").

18        By law, grant program priorities must be established when publishing the application notice

19   for new grants; the priorities cannot be changed after a multi-year grant has been awarded. *See,

20   e.g.*, 34 C.F.R. § 75.100(a) (1994) ("Each fiscal year, the Secretary publishes application notices

21   . . . *for new grants*[.]" (emphasis added)); 34 C.F.R. § 75.101(a)(4) (2024) (application notice

22   includes "[a]ny priorities established by the Secretary for the program for that year"); 34 C.F.R.

23   § 75.105(a) (2024) (describing process for establishing "priorities for selection of applications in a

24   particular fiscal year").  Continuation awards do not go through the same application process where

25   priorities can be re-established; they are solely based on the performance of the grantee. *See* 34

26   C.F.R. § 75.118 (2024) (providing for submission of performance reports); Direct Grant Programs,

27   59 Fed. Reg. 30,258, 30,259 (June 10, 1994) ("[T]he continuation award decision—including the

28   decision about whether the grantee has made substantial progress—will be based entirely on the

submission of [performance] reports as specified by the Secretary, rather than on the submission of a continuation award application.").

But DOE did not base its continuation award decision on McKinleyville's performance. Instead, it relied exclusively on new policy preferences that assertedly conflict with the original priorities on which McKinleyville relied when planning its program. In doing so, DOE violated its own regulations and unlawfully disregarded the priority that 34 C.F.R. § 75.253(c) assigns to continuation awards over new grants. 34 C.F.R. § 75.253(c) (2024); *see, e.g.*, Direct Grant Programs, 45 Fed. Reg. 22,552, 22,559 (proposed Apr. 3, 1980) (explaining that each "continuation award will be judged on the basis of the criteria in [§ 253(a)] and *will not be subject to competition with other applications*" (emphasis added)).

The Non-Continuation Decision is also contrary to law and beyond statutory authority because it defies Congress' GEPA Equity Directive requiring that applicants explain the steps they will take "to ensure equitable access to, and equitable participation in, the project or activity" funded by the grant "in order to overcome barriers to equitable participation, including barriers based on gender, race, color, national origin, disability, and age." 20 U.S.C. § 1228a(b). To the extent that DOE discontinued McKinleyville's SBMH grant because it "deal[s] with [diversity, equity, and inclusion] and [] with gender issues," its Non-Continuation Decision contravenes Congress's GEPA Equity Directive. *See* Giannini-Previde Decl., Ex. E at P.002 (suggesting that the goal of diversifying providers was the basis for discontinuing the grant). Whereas Congress expressly directed DOE to require that applicants explain how they will consider equity, DOE decided not to continue funding the District's SBMH grant at least partly *because* it considered equity. The Non-Continuation Decision is plainly unlawful.

### 4.    The Non-Continuation Decision Is Contrary to the Constitution

Under the APA, a court must "set aside" agency action "contrary to constitutional right, power, privilege, or immunity. . . ." 5 U.S.C. § 706(2)(B). As discussed below, the Non-Continuation Decision violates not only the APA, but is also contrary to constitutional rights, powers, privileges, and immunities.

**B.**    **McKinleyville Is Likely to Succeed on the Merits of Its Constitutional Claims**

In addition to the APA violations discussed above, McKinleyville is also likely to succeed on the merits of its constitutional claims because the Non-Continuation Decision violates the constitutionally mandated separation of powers and the Due Process Clause.

**1.**    **The Non-Continuation Letter Violates Constitutional Separation of Powers**

The Non-Continuation Decision should also be set aside because it violates two separation-of-powers principles: the Spending Clause and the Take Care Clause.

**a.**    **The Non-Continuation Decision Violates the Spending Clause**

The Spending Clause of the U.S. Constitution, Article I, Section 8, Clause 1, provides that Congress—not the Executive—"shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States [.]"  "Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or 'retroactive' conditions."  *State of Washington v. U.S. Dep't of Com.*, 2025 WL 2978822, at *10 (W.D. Wash. Oct. 22, 2025) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981)).  Recipients of federal funds must have fair notice, so they may "voluntarily and knowingly" accept conditions attached to federal spending.  *See Pennhurst*, 451 U.S. at 17, 25; *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583–84 (2012); *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 n.6 (9th Cir. 2019) (applying Spending Clause constraints to the Department of Justice, "an agency middleman" charged with administering funds).  Fund recipients "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain[.]'"  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17).  Thus, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."  *Pennhurst*, 451 U.S. at 17.

The Non-Continuation Decision violates these Spending Clause principles because it is (i) retroactive, (ii) ambiguous, and (iii) inconsistent with the purpose of the SBMH Grant Program, GEPA's Equity Directive, and the final rulemaking priorities governing the programs issued

1   pursuant to GEPA and 34 C.F.R. § 75.105(b).

2   **First**, DOE retroactively changed the conditions of McKinleyville's grant agreement after

3   the grant was awarded.   McKinleyville previously received the required notice of applicable

4   conditions for the grant award because DOE published priorities, requirements, and definitions.

5   *See, e.g.*, Proposed Priorities, Requirements, and Definitions-Mental Health Service Professional

6   Demonstration Grant Program, 87 Fed. Reg. 47,159 (Aug. 2, 2022); Final Priorities, Requirements,

7   and Definitions-School-Based Mental Health Services Grant Program, 87 Fed. Reg. 60,092 (Oct.

8   4, 2022).   After receiving the grant award, McKinleyville proceeded with the understanding that

9   the grant's continuation would be evaluated contingent solely on its performance.   McKinleyville

10   relied on DOE's longstanding history and practice of prioritizing continuation awards over new

11   grant awards, as well as DOE's assurance that continuation awards would solely consider

12   McKinleyville's performance and would not alter the grant conditions.   *See* 34 C.F.R. § 75.253(b)–

13   (c) (2024).   McKinleyville budgeted for, implemented, and participated in projects that fulfilled

14   these conditions.   DOE imposed new policy preferences and conditions in the Non-Continuation

15   Decision and decided—with no factual support—that McKinleyville did not satisfy the new

16   preferences.

17   **Second**, the Non-Continuation Decision unilaterally altered McKinleyville's grant

18   conditions and replaced them with unconstitutionally vague conditions.   DOE communicated the

19   Non-Continuation Decision through a two-page boilerplate letter sent to hundreds of grantees that

20   states, in conclusory fashion, that each non-continued SBMH grant "no longer effectuates[] the best

21   interest of the Federal Government," *see* Giannini-Previde Decl., Ex. C at P.002, presumably based

22   on its perceived connection with "DEI" or "gender issues."   *See* Wiener Decl., Ex. A at 67.   DOE

23   stated that the current Administration's new policy preferences included "prioritizing merit,

24   fairness, and excellence in education" without explaining the requirements to satisfy those

25   conditions or how McKinleyville failed to do so.   *See* Giannini-Previde Decl., Ex. E at P.002.   These

26   conditions are impermissibly vague.

27   **Third**, the Non-Continuation Decision is not related to the federal interest in SBMH Grant

28   Program, *i.e.*, to support the mental health and well-being of students.   Indeed, the Non-

1    Continuation Decision will result in reduced mental health support programming.  The decision is

2    therefore inconsistent with the very purpose of the SBMH Grant Program.  Moreover, Congress

3    expressly directed grant recipients to outline how their programs help "overcome barriers to

4    equitable participation, including barriers based on gender, race, color, national origin, disability,

5    and age."  *See* 20 U.S.C. § 1228a(b).  McKinleyville not only followed these directives but also

6    relied on these factors to design its program.  DOE's attempt to eliminate equity measures is at

7    odds with the purpose of the SBMH Grant Program, the GEPA Equity Directive, and the final

8    rulemaking priorities governing the Program.  *See S. Dakota v. Dole*, 483 U.S. 203, 207, 209 (1987)

9    ("[C]onditions on federal grants" must be "reasonably calculated to address th[e] particular . . .

10    purpose for which the funds are expended").

11                   **b.    The Non-Continuation Decision Violates the Take Care Clause**

12            The Take Care Clause of the U.S. Constitution provides that the Executive must "take Care

13    that the Laws be faithfully executed[.]"  U.S. Const. art. II, § 3; *see Util. Air Regul. Grp. v. EPA*,

14    573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes laws and the

15    President . . . faithfully executes them" (cleaned up)).  The Executive violates the Take Care Clause

16    where it declines to execute or otherwise undermines statutes enacted by Congress and signed into

17    law or duly promulgated regulations implementing such statutes.  *See In re United Mine Workers*

18    *of Am. Int'l Union*, 190 F.3d 545, 551 (D.C. Cir. 1999) ("[T]he President is without authority to set

19    aside congressional legislation by executive order[.]"); *Off. of Pers. Mgmt. v. Richmond*, 496 U.S.

20    414, 434–35 (1990) ("The Executive Branch does not have the dispensing power on its own [to

21    violate a congressional statute] . . . and should not be granted such a power by judicial

22    authorization") (White, J. and Blackmun, J., concurring).  While Congress may give the Executive

23    discretion over how to spend appropriated funds, this discretion cannot be so expansive that it

24    "gives the President the unilateral power to change the text of duly enacted statutes."  *Clinton v.*

25    *City of New York*, 524 U.S. 417, 447 (1998).

26            DOE has no authority to unilaterally amend the purpose of Congressional appropriations.

27    Since 1994, Congress' GEPA Equity Directive has required that any applicant for grant funding,

28    including applicants for the SBMH grant at issue here, ensure equitable access and equitable

participation in a project or activity receiving assistance by addressing program beneficiaries' needs to overcome barriers, including those "based on gender, race, color, national origin, disability, and age." 20 U.S.C. § 1228a(b). Congress established these requirements to achieve "equal access to education and to promote educational excellence throughout the Nation[.]" *Id.* § 1228a(a). The Non-Continuation Decision contradicts Congress' GEPA Equity Directive and undermines its objectives in violation of the Take Care Clause.

### 2.    The Non-Continuation Decision Violates the Due Process Clause

The Due Process Clause of the Fifth Amendment to the Constitution requires due process of law before depriving a constitutionally protected interest. Clarity is "essential to the protections provided by the Due Process Clause of the Fifth Amendment." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Flores v. Bennett*, 2023 WL 4946605, at *2 (9th Cir. Aug. 3, 2023) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). Where a law is impermissibly vague, it must be invalidated. *Fox Television*, 567 U.S. at 253. The void-for-vagueness doctrine thus addresses these "two connected but discrete due process concerns"—that "regulated parties should know what is required of them so they may act accordingly," and that "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*

Because the Non-Continuation Decision is vague and DOE has bypassed statutorily-required rulemaking to unilaterally change grant policy preferences, McKinleyville is unsure of how it can comply with DOE's new policy preferences. It is unclear which types of mental health support programs it can pursue, which populations of mental health professionals it can prioritize training, or how it should address the needs of specific student groups. This makes it impossible for McKinleyville to know how to modify its existing programs and obtain SBMH Grant funding.

## II.    MCKINLEYVILLE WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (collecting cases). Irreparable injury

is "harm for which there is no adequate legal remedy, such as an award of damages." *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).  In cases involving multi-year projects funded by multi-year grants, courts have repeatedly recognized that "[a] total loss of federal funding would be catastrophic, and the [grantee's] need for certainty renders damages inadequate." *Thakur*, 787 F. Supp. 3d at 996 (quoting *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018)).  The Ninth Circuit has held that plaintiffs in APA cases suffer irreparable harm where agency action causes a "significant change in their programs and a concomitant loss of funding[.]" *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) ("Both constitute irreparable injuries: the first is an intangible injury, and the second is economic harm for which the Organizations have no vehicle for recovery").

McKinleyville will suffer irreparable harm absent injunctive relief.  *See Washington*, 2025 WL 3004675, at *9–11 (analyzing irreparable injury flowing from the Non-Continuation Decision). Humboldt County has disproportionately high rates of adverse childhood experiences, requiring significant mental health resources.  Joshi Decl. ¶¶ 13, 25.  Without the SBMH Grant funding, McKinleyville cannot offer, in a long-term sustainable way, the mental health services crucial for children's academic achievement, psychological wellbeing, and physical safety.  *See* Giannini-Previde Decl. ¶¶ 46, 52; Joshi Decl. ¶¶ 46, 52.  Establishing programs to address student needs requires investments of significant time and energy from school leaders and administrators, and the sudden loss of funding can result in a diminished willingness for collaboration.  Weist & Barrett Decl. ¶¶ 26, 33, 36.  The loss of funding can also result in teachers losing invaluable support in managing classroom behaviors and addressing learning challenges.  McBride Decl. ¶ 26. McKinleyville will subsequently lose teachers due to burnout, thus jeopardizing the District's quality of education.  Giannini-Previde Decl. ¶ 55; Weist & Barrett Decl. ¶ 37.  And students, including tribal members, will lose connections with qualified mental health staff who are, in some cases, the only trusted adults in their lives.

Without the Court's intervention, the Non-Continuation Decision will require McKinleyville to lay off staff and cut programs.  For example:

- Instead of hiring mental health staff for the five-year grant period, McKinleyville hired its new school psychologist and school social worker in temporary positions. Maher Decl. ¶ 26. Because SBMH funding will end in December 2025, McKinleyville must now reallocate funds just to keep new staff in their roles through the end of the 2025–26 school year. *Id.* Without additional funding, McKinleyville cannot sustain these new positions beyond the current school year, and the District will have to provide layoff notices by March 15, 2026. Giannini-Previde Decl. ¶ 48. McKinleyville's Project Coordinator, tasked with overseeing the grant project at six schools across three districts, will also lose her grant-funded employment in 2026. Maher Decl. ¶ 29.

- McKinleyville was forced to abandon plans to help current staff obtain specialized degrees and certifications, and it can no longer pay staff to supervise graduate-level mental health interns in its schools. Giannini-Previde Decl. ¶¶ 50–51.

- McKinleyville must also abandon plans to develop in-house trainers for safe crisis intervention strategies and send fewer staff to one-time trainings. *Id.* ¶ 50.

As a result, DOE's actions have disrupted, and will continue to disrupt, critical services that ensure student learning and safety. These disruptions can damage students' relationships with school mental health providers, causing them to withdraw, and strain the District's limited resources. Giannini-Previde Decl. ¶¶ 52–54; Weist & Barrett Decl. ¶¶ 29–30; *see also* Joshi Decl. ¶¶ 29–30 (explaining the importance of students having a trusting relationship with adults at school). Delays in access to mental health care often contribute to school failure, absenteeism, and other school behavioral problems, particularly among at-risk Native youth. *See* Giannini-Previde Decl. ¶¶ 53–54; Moorehead Decl. ¶¶ 15–17; McQuillen Decl. ¶ 17; Sundberg Decl. ¶¶ 10–11. With fewer mental health providers in the District, there is a high risk of severe increases in students' externalized behaviors, such as disruptive conduct, verbal and physical aggression, and delinquent activities that precipitate criminal activity, as well as an increase in school avoidance, substance use, self-harm, and suicidality. *See* Giannini-Previde Decl. ¶¶ 53–54; Joshi Decl. ¶ 36; Moorehead Decl. ¶¶ 33, 35; Weist & Barrett Decl. ¶¶ 30, 35. Disruptions in these school services will cause McKinleyville students irreparable harm both in the immediate term and for students' development.

1  *See N. D. v. Reykdal*, 102 F.4th 982, 995 (9th Cir. 2024) ("It is almost beyond dispute that wrongful

2  discontinuation of a special education program to which a student is entitled subjects that student

3  to actual irreparable harm." (citation omitted)); *see also N.D. ex rel. parents acting as guardians*

4  *ad litem v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1112 (9th Cir. 2010) (Teacher furloughs caused

5  irreparable harm related to the "regression in" student's "behavior, increased difficulty with

6  activities," "outbursts of frustration and violence," and "regression in behavior leading to increased

7  aggression"); *State of California v. Bureau of Land Mgmt.,* 286 F. Supp. 3d 1054, 1074 (N.D. Cal.

8  2018) (finding irreparable harm from agency rule that "will have irreparable consequences for

9  public health"); *Michigan v. DeVos*, 481 F. Supp. 3d 984, 996 (N.D. Cal. 2020) (delaying or

10  hampering students' participation in school is irreparable harm) (citing *Certain Named & Unnamed*

11  *Non-Citizen Children & Their Parents v. Texas*, 448 U.S. 1327, 1332–33 (1980)).

12      In addition, DOE has since announced new grant opportunities with revised priorities, but

13  its plan to recompete these limited funds may deprive McKinleyville of the opportunity for relief,

14  constituting further irreparable harm.  *See Washington*, 2025 WL 3004675, at *10.   If the

15  Department awards the funds to other grantees, McKinleyville may lose access to funding entirely

16  without preliminary relief.  *See id.*

17  **III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY**
        **FAVOR PRELIMINARY RELIEF**
18

19      The balance of the equities and the public interest favor an injunction.  In a case against the

20  government, these factors merge.  *Keene v. City & Cnty. of San Francisco*, 2025 WL 341831, at *1

21  (9th Cir. Jan. 30, 2025); *Wolford v. Lopez*, 116 F.4th 959, 976 (9th Cir. 2024).  Here, both factors

22  tip sharply in McKinleyville's favor.  The threat of harm to McKinleyville's mental health care

23  infrastructure far outweighs the federal government's purported interest in ending programmatic

24  mental health care funding in schools.  *See Jaffee v. Redmond*, 518 U.S. 1, 11 (1996) ("The mental

25  health of our citizenry, no less than its physical health, is a public good of transcendent

26  importance."); *San Francisco Unified Sch. Dist. v. AmeriCorps,* 789 F. Supp. 3d 716, 739 (N.D.

27  Cal. 2025) (recognizing a public interest in continuing aid programs to communities in need,

28  including "youth with high rates of truancy and low rates of academic engagement").  As the court

recognized in *Washington*: "The hardships faced by [districts] . . . far outweigh the hardship to the Government in pausing the recompeting of funds," and "the public is served by requiring the Government to provide reasoned explanations and to consider reliance interests[.]"  2025 WL 3004675, at *11.  The balance of equities supports an injunction, and the Court should preserve the status quo until the case is decided on the merits.

Whatever interest the federal government may have in cutting off mental health care services to students during the pendency of this case pales in comparison to the irreparable harm suffered by McKinleyville as it loses vital mental health services for its students.  A preliminary injunction would not harm DOE at all; it would merely maintain the status quo by requiring DOE to administer appropriated funds as directed by Congress.  *See Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health and Hum. Servs.*, 328 F. Supp. 3d 1133, 1150 (E.D. Wash. 2018) (finding public interest weighed in favor of continued grant funding to "prevent harm to the community[.]").  The balance of equities and the public interest weigh decidedly in McKinleyville's favor.

## CONCLUSION

For these reasons, McKinleyville respectfully requests a preliminary injunction enjoining Defendants from (1) implementing or enforcing the Non-Continuation Decision, including recompeting SBMH Grant Program funds; and (2) reinstituting the Non-Continuation Decision based on the same or similar reasons, or for denying a continuation award based on any performance issues caused by the Non-Continuation Decision and its disruptive effects.

Date: November 20, 2025

PUBLIC COUNSEL

/s/ Mark Rosenbaum
Mark Rosenbaum
Tara Ford
Mayra Lira
Amanda Mangaser Savage
Amelia Piazza
Jacob Maddox
Vanessa Rae Young

1    Date: November 20, 2025                MORRISON & FOERSTER LLP

2

3                                           */s/ Dan Marmalefsky*
                                           Dan Marmalefsky
4                                          David J. Wiener
                                           Michelle Sosa-Acosta
                                           James K. Murray
5

6    Date: November 20, 2025                CALIFORNIA TRIBAL FAMILIES
                                           COALITION
7

8                                           */s/ Kimberly Cluff*
                                           Kimberly Cluff
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## **ECF ATTESTATION**

I, Dan Marmalefsky, am the ECF User whose ID and password are being used to file this **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION**. In accordance with Civil Local Rule 5-4.3.4(a)(2), concurrence in the filing of this document has been obtained from each of the other signatories, and I shall maintain records to support this concurrence for subsequent production for the Court if so ordered or for inspection upon request by a party.

Dated: November 20, 2025                    */s/ Dan Marmalefsky*
                                                            Dan Marmalefsky